**Boone DESKINS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

April 19, 1974.

Richard E. Vimont, Lexington, Charles E. Lowe, Pikeville, for appellant.

Ed W. Hancock, Atty. Gen., G. Edward James, Asst. Atty. Gen., Frankfort, for appellee.

JONES, Justice.

This appeal brings to us for review a judgment of the Pike Circuit Court, entered upon a verdict finding appellant, Boone Deskins, guilty of the crime of the murder of his wife, Gladys Deskins, and fixing his punishment at confinement in the penitentiary for life. The indictment accused Deskins of conspiring with Willard Christian, William Eugene Thompson and Robert Sykes to kill Gladys Deskins.

The facts as presented by the Commonwealth were that Christian was hired by Deskins to commit the foul deed and that Christian enlisted the aid of Thompson and Sykes to kill Mrs. Deskins.

Boone and Gladys Deskins had been married approximately forty years, but a divorce action had been pending in the

**522**

Pike Circuit Court since 1966. It was shown in evidence that by thrift and good management Boone and Gladys had acquired as a result of their joint efforts much valuable property in Pike County, and it appears that the divorce had not become final because the two could not agree on a distribution of property.

At the time of the brutal slaying of Gladys, she was living in a small four-room house on John's Creek in Pike County. Boone lived in a trailer at Zebulon in Pike County. On July 12, 1971, the day Gladys was found at her home stabbed several times with a knife and a goodly portion of her head blown away by a shotgun blast, she was to appear with her attorney and with counsel for Boone before the Master Commissioner of Pike County for further divorce proceedings. When she failed to appear at the office of her lawyer at the appointed time, inquiry was made of the neighbors who found her in her bedroom, where she had been murdered.

Almost a year later after an intensive investigation by law enforcement agencies, Boone Deskins and his confederates were indicted for her murder by a Special Grand Jury of Pike County. The Commonwealth's Attorney elected to try Boone first. Deskins employed counsel, was arraigned; and the case was assigned for trial. After one continuance, the case came on for trial at the March 1973 term of the Pike Circuit Court.

In the meantime, for reasons known only to Willard Christian and his Creator, he confessed and told the officers the specifics of the brutal slaying of Gladys Deskins.

Christian testified that Deskins first approached him concerning the commission of this crime in the early summer of 1971. Deskins disclosed on that occasion that he wanted Christian to burn a house located near the house in which Gladys was living. Christian testified that he went to Deskins' trailer where Deskins "asked me how I would feel about burning a house, and I told him I would do it," and he (Des-

kins) said, "after you do that I've got another job for you with more money." Christian further testified that he, along with Robert Sykes and another unidentified person, burned the house and that the following day Deskins paid him one thousand dollars, "and he told me to come over in two or three nights that he had another job for me."

At the trial, Christian testified that some few days later he went to Deskins' trailer,

" . . . and he asked me if I would kill someone and I told him, no, that I wouldn't kill someone myself, and he told me that I should know somebody that would, and I told him that I would check around and see. He told me he would pay seven thousand dollars for the death of his wife, for killing his wife, because she was giving him a lot of trouble and wouldn't give him a divorce."

Christian testified that after discussing Deskins' offer with Robert Sykes, he (Christian) and Sykes contacted William Eugene Thompson, who agreed to commit the murder. Christian further testified that on the evening of July 11, 1971, Sykes drove him and Thompson to a point near Gladys Deskins' home. We deem it appropriate to let Christian tell in his own words what happened. He testified as follows:

"We (Christian and Thompson) crossed the creek, waded the creek at about twenty-five or thirty feet apart, and went up on the railroad tracks and proceeded toward Mrs. Deskins' house. About half way from where we crossed the creek to her house, we set (sic) down on the railroad tracks because the lights were still on in her house. We sat there approximately an hour until the lights went out in her house and then we sat there awhile longer and then we proceeded on up to Mrs. Deskins' house. I stopped at an oil drum that looked like where they had burned garbage and Eugene proceeded on to the house. He went to the lower part of the house, toward John's Creek school and he was making all

kinds of noise. So I was left there to fire a shot in case anybody came up. Well, I got scared and left, went back down the railroad track, across the creek and just as I . . . during all this time he was a makin' all kinds of noise, kickin' or something, I'm not sure on the building, and when I got behind the pumping station, above the John's Creek school there, I heard a shotgun blast and I waited there maybe five minutes and Eugene Thompson joined me . . . ."

Christian further testified that he, Sykes and Thompson then proceeded up Caney Creek where they buried the shotgun and that he threw away his shoes. Later, Christian assisted the officers in locating the buried shotgun and his shoes and identified them as exhibits at the trial. Christian then stated that on the evening following the murder he went to Deskins' trailer where Deskins handed him six thousand, nine hundred dollars. (One hundred dollars was withheld for a revolver that Deskins had provided Christian.) Christian then divided the money with Thompson and Sykes.

Deskins testified that he sent for Archel Davidson (Archel Davidson, an employee of Francis Dale Burke in a coal business operated by Burke, was a tried and trusting friend of Deskins. Francis Dale Burke, a practicing attorney of the Pike County bar, was employed as counsel to assist in the prosecution of Deskins), to meet him at his trailer on February 18, 1973, less than a month before the trial date. As a result of this meeting Deskins agreed to pay Davidson six hundred dollars for copies of material contained in the file of the Commonwealth's Attorney concerning his case. Davidson assured Deskins that he had a daughter-in-law who worked in Burke's office, and that it would be no problem to get the needed materials. Davidson then made this arrangement known to Burke and on February 20, 1973, Burke handed Davidson an envelope containing documents purportedly from the Commonwealth's files. On that same morning, Davidson met Sgt. Marion Campbell of the Kentucky State Police, an expert in electronics, who taped a microphone and radio transmitter under Davidson's clothing. Davidson proceeded to Deskins' trailer and the ensuing conversation between Davidson and Deskins was recorded. The tape recording, which was introduced in evidence, contains the following language which the Commonwealth's Attorney contends is corroborative of Deskins' connection with the murder of his wife:

Davidson: "I've read Woody Christian's statement here on this thing. I've got the hospital but she didn't get it all. I know, cause I didn't get to talk to her. But they's some shit right here that I want you to read. That son-of-a-bitch had told about the first time that he was ever-about the *house was burnt over there and how you paid him.*"

Deskins: "What I paid him?"

Davidson: "Over at the ice plant and who was with him, all about anything you . . ."

Deskins: "Who was with him, *there wasn't nobody with him.*"

Davidson: "Now right here is Woody Christian's evidence, the most important part of it all and you sit right down and read it."

Deskins: "Well, that's about all they got here."

Davidson: "Well, right there is what you want, right there."

Deskins: "Yeah, what Woody Christian told."

Davidson: "They ain't got no case against you. They ain't got nothing said that you ever done anything, just what he told."

Deskins: *"Just the money."*

Davidson: "Yeah, just the money."

Deskins: "Hell yes, well I knowed that was . . . 'had to be true anyhow.'"

(Emphasis added)

The rest of this tape and other conversations similarly recorded on March 3, 1974, and March 4, 1974, merely demonstrate the existence and consummation of a plan whereby Deskins paid Davidson for the purloining of copies of statements of witnesses. These statements were represented by Davidson to be copies of statements contained in the files of the Special Prosecutor, Francis Dale Burke.

The matters of which Deskins complains as error are: (1) that the Commonwealth did not supply Deskins with a bill of particulars sufficiently apprising him of the circumstances of the crime charged; (2) that the trial court allowed the Commonwealth to introduce evidence (recordings of statements made by Deskins while conversing with Davidson) which the Commonwealth had not previously produced pursuant to a court order relating to discovery; (3) that the trial court allowed Deskins' extra-judicial statements to be admitted in evidence when the statements were obtained in violation of Deskins' right to the assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution; (4) that the testimony of an accomplice was not corroborated; and (5) that the trial court allowed the Commonwealth to introduce photographs of the victim which served only to bias and prejudice the jury. It is readily discernible that each allegation of error in a measure is intertwined with the others.

Deskins' first complaint is totally without merit. RCr 6.22 relating to a bill of particulars states:

"The court for cause shall direct the filing of a bill of particulars. A motion for such bill may be made at any time prior to arraignment, or thereafter in the discretion of the court. A bill of particulars may be amended at any time subject to such conditions as justice requires."

More than six months after Deskins had been indicted and arraigned, his counsel filed a scatter-gun or catch-all type of motion for a bill of particulars. This motion was impracticable and it was impossible for the Commonwealth to respond appropriately. Thus the motion was overruled. Thereafter, Deskins filed a more precise, amended, motion for a bill of particulars to which the Commonwealth readily responded. On March 2, 1973, Deskins filed objections and exceptions to the response and filed another motion for an amended bill of particulars. The trial court's ruling on this motion does not appear of record, and was conceded by the parties to be overruled by implication. We cannot perceive that Deskins was prejudiced by the fact that he did not receive the exact date, time and place he was alleged to have conspired to commit the murder of Gladys Deskins. It is a basic premise of the law that the granting of a bill of particulars, after an indictment has been returned addresses itself to the sound discretion of the trial court which will not be overturned on appeal unless there is an abuse of this discretion. James v. Commonwealth, Ky., 482 S.W.2d 92 (1972). Here, it is clear that the Commonwealth sufficiently complied with Deskins' motion for a bill of particulars by giving all the information available. During the trial there were no dates proven simply because the witnesses could not remember the exact dates on which the conspiracy was formulated. In Harris v. Commonwealth, Ky., 285 S.W.2d 489 (1956) we said:

"A corollary rule is that the particulars should not be required when the motion appears to be merely an exploratory maneuver or when the accused apparently has knowledge of the facts or where the means of obtaining the facts are just as accessible to him as to the prosecution." (At 492)

Thus, there was no abuse of discretion in this respect on the part of the trial court.

Deskins next contends that it was prejudicial error for the Commonwealth's Attorney to introduce evidence at trial

which he had not produced pursuant to a pre-trial discovery order under the provisions of RCr 7.24. The evidence which is the subject of this contention consists of the three tape-recorded conversations between the witness, Archel Davidson, and the appellant, Boone Deskins. The trial court had a hearing in chambers, out of the presence of the jury on the introduction of the tapes in evidence. He permitted counsel for Deskins to examine Sergeant Campbell of the Kentucky State Police about the manner of the recordation of the tapes, and had the tapes played in the presence of Deskins and his counsel. We are of the opinion that this constituted compliance with the provisions of RCr 7.24.

We deem it appropriate to show in more detail the relationship between Deskins and Davidson, regarding the subject of the recorded conversations, as well as the procurement of documentary evidence from the files of the Commonwealth's Attorney. They were long-time friends and had the same tendency toward greed. Deskins wanted the files of the Commonwealth; Davidson wanted the six hundred dollars. They struck a bargain, and each lived up to it. Deskins was conversing with a person known to him and whom he recognized. He had no guarantee that Davidson would not reveal what he said, and his attempt to interfere with the processes of the trial court and obtain papers illegally from the Commonwealth's files was admitted by Deskins, for he stated that he delivered the files to his counsel. Deskins testified that his attorneys were aware of the files filched from the Commonwealth, and that he delivered the documents to his attorneys. He further testified that when his counsel received the documents, they laughed about it. Deskins insisted that his attorneys told him that the documents were worthless, yet he was most anxious to receive further documents on the day preceding the commencement of the trial, and they were delivered to him by Davidson on a stairway leading to the office of one of his attorneys.

There was no obligation on the part of the Commonwealth to contact either Deskins or his counsel and to advise them when it was obvious that the tapes were used simply to corroborate the evidence of the witness, Davidson.

The character of the tapes in question is such that Deskins was attempting to subvert the ordinary process of justice by stealing the files from the Commonwealth. It appears from the evidence of record that there is absolutely no conflict as to who made the first contact: Deskins testified that he contacted Davidson; Davidson testified, "I didn't contact him, he contacted me."

When the Commonwealth's Attorney first learned of the attempt to subvert the judicial process he notified the trial court and obtained an order allowing the tape recordings of the conversations between Deskins and Davidson.

Deskins contends that the conversations between him and Davidson and the tape recordings of those conversations are inadmissible under the authority of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). We are unwilling to extend the principles enunciated by *Massiah*, supra, to the facts in this case for the simple reason that we think the principles are inapplicable and the facts are distinguishable.

The unique circumstances of the case at bar take it outside the realm of the ordinary criminal discovery case wherein a defendant has made statements to law enforcement officers. Here, Deskins contacted a private individual, his trusted friend, soliciting this friend to steal files from the office of the Commonwealth's Attorney, pertaining to his case. The record shows that the first hearing on the discovery motion was held on January 16, 1973. The first contact between Deskins and Davidson was more than a month later, and was had on February 18, 1973. A second contact was made on February 20, 1973, after which the Commonwealth's At-

torney obtained permission of the trial court to record the conversations between Deskins and Davidson. The Commonwealth's Attorney need not sit idly by when it is discovered that a defendant, under indictment, and represented by counsel, is undertaking to steal copies of the investigative files of the Commonwealth. In an orderly society there can be no question that individual constitutional rights are not broad enough to allow one charged with crime a license to poison the very foundation of the judicial process. Boone Deskins was not at liberty to personally, or through counsel, subvert the judicial process itself.

■ Deskins' third argument again concerns the tapes. Under *Massiah,* supra, he contends that since he was represented by counsel at the time the tapes were made, he was denied his Sixth Amendment right to counsel. In other words, he says that at any conversations that he had with Davidson, his counsel should have been present. We reiterate that the facts in the case at bar place it outside the rationale of *Massiah,* supra. In *Massiah,* supra, the United States, in trying to gather evidence to use at the trial, sent an informer (who Massiah obviously trusted) to talk to Massiah. During the ensuing taped conversation Massiah incriminated himself. The Supreme Court of the United States held this was a violation of the Sixth Amendment right to counsel.

The facts in this case are clearly distinguishable. Here, Deskins, under indictment, represented by counsel, initiated a contract with a private individual (Davidson) and had him steal files from the Commonwealth's Attorney and sell them to him. Davidson could in no way be considered an agent of the Commonwealth. Instead of actually stealing the files, Davidson contacted the special prosecutor, who sought and obtained the aid of the trial court to authorize the electronic surveillance and recordings of subsequent meetings between Deskins and Davidson.

When a defendant imposes his trust in a friend voluntarily, and makes incriminating remarks to his friend, there is nothing that can prevent such person from testifying as to what the defendant stated. In Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374, 382 (1966), the United States Supreme Court stated:

> "Neither this court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it . . . ."

See also Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

The record in this case reflects that the trial court noted that Deskins' attorneys were aware of the meetings between Deskins and Davidson. On an occasion when the Commonwealth's Attorney made known to the trial court that he had observed in the possession of Deskins' attorneys some of the papers which had been given to Davidson to convey to Deskins, the trial court stated at a hearing in chambers,

> "So I don't believe that under that situation, that [Deskins] was in a position to claim that he was not properly represented."

We conclude, as did the trial court, that Deskins was not denied his Sixth Amendment right to counsel.

■ Deskins next contends that there was insufficient corroborating evidence to link him to the commission of the crime. Under the facts and the record, this contention is without merit. The Commonwealth agrees that Christian is an accomplice, and that there is required other evidence linking Deskins with the crime before a conviction can be had on the testimony of Christian. RCr 9.62. This court has consistently held that the corroborative evidence is not required to be so strong as to support a conviction by itself, but it is sufficient if it has a tendency to connect

the defendant with the commission of the offense. Hunt v. Commonwealth, Ky., 466 S.W.2d 957 (1971). The admissions made by Deskins to Davidson clearly linked him with the crime for which he was charged.

■ Finally, Deskins contends that the trial court erred by allowing the introduction in evidence of photographs of the decedent. All the photographs were taken at the scene of the crime and revealed the nature of the wounds and the position of the decedent at the time she was found by the officers. In this advanced technological age of television, movies and the news media, those persons selected as jurors are able to view a picture of the body of a victim of crime without prejudice to the defendant. Napier v. Commonwealth, Ky., 426 S.W.2d 121 (1968). We hold that the photographs were competent evidence of the fact that murder had been committed and that Gladys Deskins had died as a result of the gunshot wound.

The state of the case as related by the evidence establishes both the conspiracy and the crime contemplated by the conspiracy. Boone Deskins initiated and set in motion the events that led to the death·of his wife, Gladys. The direct result of his contact with Willard Christian and the authority he gave Christian to enlist the assistance of others in carrying out the unlawful conspiracy to commit the crime made him a participant with the same force and effect as if he were physically present with those who committed the foul deed.

A judgment of conviction will not be reversed except when upon a consideration of the whole case, this court is satisfied that the substantial rights of the defendant have been prejudiced. We said in Renaker v. Commonwealth, 172 Ky. 714, 189 S.W. 928 (1916):

"It is not every error of law on the record that will justify a reversal, but every error relied on will be subjected to the test: Did it prejudice the substantial rights of the accused? If it did, a new trial will be ordered; if it did not, an affirmance of the judgment of conviction will necessarily result." (At 934).

The application of this rule applied to the facts in the case at bar furnishes no ground for disturbing the jury verdict and the judgment of the trial court.

The judgment is affirmed.

All concur.