Kathleen WISE, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2012–SC–000633–MR.

Supreme Court of Kentucky.

Dec. 19, 2013.

Steven Jared Buck, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, David Wayne Barr, Assistant Attorney General, Office of the Attorney, General Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

The Appellant, Kathleen Wise, was convicted of intentional murder and sentenced to life in prison. On appeal, she alleges two errors. First, she argues that the trial court erred when it denied her motion to suppress statements she gave to police after a polygraph examination because she did not knowingly and voluntarily waive her *Miranda* rights. Second, she claims that the trial court erred when it failed to instruct on the lesser-included offense of first-degree manslaughter. For the reasons set forth herein, this Court affirms her conviction and sentence.

## I. Background

On the morning of June 8, 2011, the Appellant found her 71–year–old husband, Kenneth Wise, dead in his bed.

Taylor County Coroner Terry Dabney went to the Wises' home to examine the body. Upon his arrival, the Appellant told the coroner that her husband had not been feeling well the previous day, that he had gotten sick to his stomach in the middle of the night, and that he had been vomiting and stumbling around in the bathroom. The Appellant told the coroner that she had asked Kenneth if he would like to go to the hospital, but that he had declined. She stated that Kenneth had complained to her of chest pains and that she had given him a nitroglycerin pill before he had returned to bed.

The coroner conducted a visual examination of Kenneth's body, and based upon his conversation with the Appellant and Kenneth's medical history, which included a

history of heart problems, determined the cause of death to be a heart attack. He also collected blood and urine samples from Kenneth's body, as was his custom when no one had witnessed a death, and sent them to a toxicology laboratory to be analyzed.

The laboratory's test results revealed that Kenneth had likely died of a morphine overdose. At the time of his death the concentration of morphine in his blood was 5,738 nanograms per milliliter. According to testimony at trial, the typical therapeutic range for morphine is between 10 to 80 nanograms per milliliter.

The coroner contacted the Taylor County Sheriff's Department and spoke to Deputy Sheriff Brian Pickard about the circumstances surrounding Kenneth's death. Deputy Pickard conducted several interviews to learn more about the Appellant's and Kenneth's relationship. Through his investigation, Deputy Pickard learned that the Appellant had worked as a nurse for over thirty years and was employed at the Medco nursing home in Taylor County. He also discovered that the Appellant, as part of her job duties, was responsible for storing narcotics and destroying narcotics that were no longer needed by the nursing home.

A week later, Deputy Pickard interviewed the Appellant at the Taylor County Sheriff's Department. Prior to this interview, the Appellant was advised of her *Miranda* rights and signed a waiver form waiving her rights for that interview. The Appellant told Deputy Pickard a story very similar to the one that she told the coroner. She said she thought her husband was suffering from some kind of virus on the day he died. She also stated that during the night she had heard Kenneth in the bathroom and had found him leaning against the window sill with a broken towel rack in his hands—the apparent result of falling. The Appellant said she gave Kenneth a nitroglycerin pill and he returned to bed. She stated she. heard him snoring at 5:30 a.m., but that when she checked on him between 8:00 or 8:30 a.m., he was dead. At the end of the interview, the Appellant consented to Deputy Pickard's request to take a polygraph at police headquarters in Louisville. The polygraph was scheduled for five days later.

On the day of the polygraph examination, the Appellant rode with Deputy Pickard and another deputy to Louisville. In Louisville, the polygraph examination was administered by Louisville Metro Police Detective Mark Bratcher. Before beginning the examination, Detective Bratcher confirmed the Appellant could read and write and gave her a form to sign. In pertinent part, the form stated: [1]

I, Kathleen Wise, voluntarily—without threats, duress, coercion, force, promises of immunity or reward agree and stipulate to take a polygraph examination for the mutual benefit of myself Louisville Metro Police Department. I fully realize that. I am not required to take this examination. I may remain silent the entire time I am here; anything I may say can be used against me in any court of law. I may first consult with an attorney; or anyone I wish to before either signing this form or taking the examination. I may have an attorney present, in the building if I cannot afford an attorney and desire one a attorney will be appointed for me prior to my questioning, and I have the opportunity

---

1. The language quoted is reproduced as it appears on the form. Several typographical and other errors are present and reproduced in the quotation. We have chosen not to employ the standard "sic" notation to indicate those errors, as it would have become distracting and cumbersome.

to exercise all these rights at any time I wish to during the entire time I am here. I consent to the use of electronic hearing and recording devices and I voluntarily request and authorize the Louisville Metro Police Department to now proceed with the examination.

The Appellant looked over the form for less than a minute and signed it. Detective Bratcher did not read the form to the Appellant, but he did ask her if she had any questions or concerns before beginning the exam. She indicated she did not. Detective Bratcher then began the polygraph examination.

At the conclusion of the examination, Detective Bratcher told the Appellant that she had "reacted" to the polygraph examination and told her, "This is your opportunity to tell the truth." Detective Bratcher did not give the Appellant any additional *Miranda* warnings at this time. The Appellant then told Detective Bratcher that she took "a lot" of morphine home with her from Medco on June 6, 2011, and that she had stored it in a glass or jar at her home.[2] She then stated that on June 7, 2011, she had given her husband the morphine in his drinking water. The Appellant stated that she felt bad about it and was disappointed she had put so much of it in his water. She stated that she should not have done it. None of these statements to Detective Bratcher was recorded, as is the policy for all polygraph examinations conducted at the Louisville Metro Police Department.

It is also the policy of the Louisville Metro Police Department to turn over any investigation to local investigating officers if an examinee makes an admission to a crime during a polygraph examination. The policy also requires investigating officers from the crime's locale to be on-site at the Louisville police department when a

polygraph examination takes place. Thus, after the Appellant's admissions, Detective Bratcher turned the questioning over to the Taylor County deputies, who had been watching the polygraph examination by closed circuit television monitors.

After Detective Bratcher finished talking with the Appellant, he told her he was going to let her speak to the Taylor County deputies. Detective Bratcher then walked to where the deputies had been watching the Appellant's polygraph examination and told them, "It's your turn to take over." Detective Bratcher then returned to the polygraph examination suite and escorted the Appellant to a different office on the same floor of the police department. The Taylor County deputies were waiting there when the Appellant entered the room. Detective Bratcher estimated that thirty seconds to two minutes elapsed from the time the Appellant finished making her admissions to him until the time she entered the room with the Taylor County deputies. Detective Bratcher then briefly left the room and returned with the form the Appellant had signed before the polygraph examination.

The Appellant's interaction with the Taylor County deputies was recorded on video. The recording shows Detective Bratcher giving the form that the Appellant had signed to Deputy Pickard, who then showed the Appellant the form and asked her if the signature on the document was hers. She indicated to Deputy Pickard that her signature was on the form. Deputy Pickard and the other deputy then began interviewing the Appellant.

The Appellant told the deputies that she and her husband had not been speaking for almost two and a half months and that her husband had asked her son to call her

2. A subsequent audit of Medco's morphine supplies revealed that 1,515 milligrams of morphine were missing.

to ask if she wanted a divorce. The Appellant stated that she had told her son she did not believe she wanted a divorce and that he had relayed that information to her husband. The Appellant stated that she had also personally spoken to her husband and told him she did not want a divorce.

The Appellant then told the deputies that she had taken morphine home from her work and had put it in her husband's drinking water. A deputy asked the Appellant, "You gave him the water and morphine and you really didn't think that it'd kill him, is that what you said?" The Appellant replied, "I didn't think that it would. I mean, it was just, it wasn't a great amount." The deputy then asked if she had given her husband the water to intentionally kill him or to make him sick. The Appellant answered, "I did not want to kill him." She also stated, "I know that I did not want him to die. I know that."

The Appellant then stated:

[My husband] was not a very nice person to me. I mean, I didn't want him to die. I didn't want to kill him. But you know he was so controlling. I had no rights. You know I worked, I would get $350 out of my paycheck, and he got the rest, you know. He would buy things and not tell me. None of this is an excuse for killing anybody, and I'm not making excuses for myself. I'm not.

The Appellant also stated that her husband would sometimes push her around.

When the deputies asked the Appellant what she had expected to accomplish by giving her husband water mixed with morphine, she replied:

I had not even thought about it before. I had not deliberated on anything like that. I just was thinking, you know, tonight, I can just maybe get some peace. I can just sit here and not have to worry about him screaming at me about something.

A deputy then asked her, "You just thought he would go to sleep?" The Appellant replied, "I just thought he'd have a good night's sleep." She later stated, "Intentionally, I could never kill anyone, no matter how bad they were to me. I just couldn't do it."

Following the interview, the Appellant was transported back to Taylor County and placed under arrest. Within a few weeks, the Taylor County Grand Jury indicted the Appellant on one count of murder.

The Appellant moved to suppress the statements she had made after the polygraph examination. She argued that her *Miranda* rights had been violated and that any waiver of those rights had not been knowing and voluntary. The trial court held a suppression hearing and afterward denied the Appellant's motion. The trial court ruled that the polygraph form had been sufficient to inform the Appellant of her rights and that she had made a knowing and voluntary waiver of those rights when she signed the form at the Louisville Metro Police Department. The court concluded that the form was sufficient to advise the Appellant of her rights for questioning by both Detective Bratcher and the deputies from Taylor County. The court also found that the Appellant was not in custody at the time of her admissions, and thus *Miranda* warnings were unnecessary.

The case proceeded to trial. The jury was instructed on intentional murder and wanton murder. The jury also received instructions on the lesser-included offenses of second-degree manslaughter and reckless homicide. Nothing in the record shows that the Appellant tendered any proposed jury instructions or requested instructions on any other lesser-included offenses, though the record does show that defense counsel objected to the instruction on wanton murder.

The Appellant was found guilty of intentional murder and sentenced to a term of life in prison. This appeal follows as a matter of right. *See* Ky. Const § 110(2)(b).

## II. Analysis

### A. *Miranda* Issue

The Appellant claims that the trial court erred by admitting the statements she made to police officers after the completion of her polygraph examination at the Louisville Metro Police Department. Specifically, she argues she did not knowingly and voluntarily waive her *Miranda* rights when she made incriminating statements to Louisville Metro Police Detective Mark Bratcher, the officer who administered the polygraph exam, or when she gave further details to the two Taylor County deputies shortly after speaking to Detective Bratcher. This issue was properly preserved for appeal by the Appellant's motion to suppress.

■ On appeal, the standard of review of the denial of a motion to suppress consists of a two-step analysis. First, the court must determine whether the factual findings of the trial court are supported by substantial evidence. Second, the trial court's conclusions of law are reviewed *de novo* to determine if the court's decision is correct as a matter of law. *See Jackson v. Commonwealth*, 187 S.W.3d 300, 305 (Ky. 2006); *see also* RCr 9.78. The Appellant does not challenge the trial court's findings of facts, but instead limits her challenge to the trial court's conclusions of law.

The analysis in this case is complicated by the Appellant's "shotgun approach" to challenging the suppression of her statements. *Rogers v. Commonwealth*, 86 S.W.3d 29, 34 (Ky.2002) (describing Appellant's arguments that statements he gave to police were not knowing and voluntary as a "shotgun approach."). She has challenged every part of the trial court's *Mi-*

*randa* analysis as flawed and erroneous, arguing that (1) the trial court erred when it held that she was not in custody, and therefore not required to receive *Miranda* warnings; (2) that she did not waive her *Miranda* rights as to the post-polygraph questioning, either expressly or impliedly, by signing the polygraph examination form prior to the examination; and (3) even if she did waive her *Miranda* rights as to the post-polygraph questioning, she did not do so knowingly or voluntarily.

At the outset, although the Appellant asserts that the trial court erred by holding that she was not in custody, this Court need not address that issue because we hold that the Appellant was given sufficient *Miranda* warnings and sufficiently waived her rights as to the polygraph examination and all post-polygraph questioning. Additionally, we will segment our analysis into three discrete parts: (1) whether the Appellant was sufficiently "Mirandized" and whether she validly waived those rights prior to beginning the polygraph examination; (2) whether her waiver extended to post-examination questioning by the officer administering the polygraph examination; and (3) whether her waiver also extended to post-examination questioning by the Taylor County authorities investigating the death of her husband.

### 1. *Pre–Polygraph Examination* Miranda *Warnings and Waiver*

■ Under *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), statements made by an accused during a custodial interrogation are inadmissible unless the accused is advised of his rights. Specifically, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an

attorney, either retained or appointed." *Id.*

■ That police gave warnings, however, does not end the inquiry. The prosecution must also prove "that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins,* 560 U.S. 370, 382, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (quoting *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), alteration in original). The waiver analysis "has two distinct dimensions." *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). First, the "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Moran,* 475 U.S. at 421, 106 S.Ct. 1135). Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382–83, 130 S.Ct. 2250 (quoting *Moran,* 475 U.S at 421, 106 S.Ct. 1135).

■ The first issue to be addressed is whether the Appellant's waiver was knowingly given.[3] Indeed, the resolution of that question establishes both whether there was a waiver and whether it was knowingly made. An examination of the form that the Appellant signed before she took the polygraph answers these questions.

This form had a dual function. The Appellant's signature on the document signified not only that she consented to the polygraph examination and that she had been advised of and understood her *Miranda* rights, but also that she released the Louisville Metro Police Department from any legal claims she might have as a result of taking the polygraph examination. From a plain reading, however, the form only contains an express waiver as to any tort claims by the signatory, not as to any constitutional rights. There is no express

---

3. In its order denying Appellant's motion to suppress, the trial court noted that the Appellant had received *Miranda* warnings on "two occasions" prior to post-polygraph questioning at issue in this case. One occasion was when the written *Miranda* warnings were given immediately before the polygraph examination on July 19, 2011. The other "occasion" was when Appellant was interviewed five days earlier, on July 14, 2011, in Taylor County. The trial court's order emphasized that being read her rights on these "two occasions" certainly contributed to the knowing and voluntariness of the Appellant's waiver as to post-polygraph questioning because both occasions sufficiently advised the Appellant of her rights.

It is not clear, however, that the first set of warnings (July 14) have any relevance to whether the Appellant waived her rights on July 19, as that warning may have become "stale." But neither the U.S. Supreme Court nor this Court has addressed when *Miranda* warnings "go stale," that is, when previously given warnings are no longer sufficient to

advise a defendant of his rights. While "an excessive delay between an initial and subsequent interrogation can vitiate the effect of the *Miranda* warning given at the initial interrogation," *United States v. White,* 68 Fed. Appx. 535, 542–43 (6th Cir.2003), there is very little consensus in other jurisdictions of how long that delay must be, or whether there are other additional factors courts should consider, *see, e.g., United States v. Nakhoul,* 596 F.Supp. 1398, 1401–02 (D.Mass.1984); *Commonwealth v. Wideman,* 460 Pa. 699, 334 A.2d 594, 599 (1975); *United States v. Edwards,* 581 F.3d 604, 607–08 (7th Cir.2009).

We need not decide the issue of "staleness," however, because the Commonwealth has not argued that the July 14 warning affected the Appellant's waiver on July 19. Moreover, as explained below, we believe Appellant was sufficiently advised of her rights based on the warnings she received on July 19. Nonetheless, the July 14 warnings bolster the Commonwealth's argument that the July 19 warnings were sufficient.

waiver of the Appellant's rights in the form.

■ But a waiver does not have to be express and can instead be implied. *See id.* at 383, 130 S.Ct. 2250 ("The course of decisions since *Miranda*, informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered."). Indeed, the "main purpose" of *Miranda* is that an accused is made aware of and understands his rights, *id.*, and "[a]lthough *Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a *Miranda* warning, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights." *Id.* at 385, 130 S.Ct. 2250.

■ However, the mere giving of warnings and an uncoerced statement is not enough to show an implied waiver of *Miranda* rights. *Id.* at 384, 130 S.Ct. 2250. It must also be shown that "the accused understood these rights." *Id.* However, "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385, 130 S.Ct. 2250.

■ This Court concludes that the Appellant impliedly waived her *Miranda* rights before beginning the polygraph examination. The form sufficiently stated her rights, and although the Appellant was not read the form by a law enforcement officer, it was not given to her to review and sign until she admitted to the examining officer she was literate and college-educated.[4] There was also testimony at the suppression hearing that the Appellant was given an opportunity to read the form and to ask questions after she had read it before the examination. Despite all of this, and despite her quick review of the document, the Appellant chose to proceed with the examination and no additional evidence was presented that she did not understand her rights.

As noted earlier, the form the Appellant signed was not a waiver of her constitutional rights; it was merely an advisement and acknowledgment that she understood these rights. While it cannot be said that she *expressly* waived her *Miranda* rights, her actions after reviewing and signing the form amounted to an *implied* waiver. Her proceeding with the polygraph examination after being advised of her rights was "inconsistent with their exercise" and her actions can be interpreted as "a deliberate choice to relinquish the protection those rights afford." *Id.* at 385, 130 S.Ct. 2250. Indeed, as in *Thompkins*, there is no real contention that the Appellant "did not understand [her] rights" after she was given the form explaining her rights. *Id.* at 385, 130 S.Ct. 2250. "[F]rom this it follows

---

**4.** The Appellant makes a vague argument that because she was not read her *Miranda* rights by law enforcement that she was not sufficiently advised of her rights. Although in some cases this might be true, such as where an accused is illiterate, this is not the case here. "As a general rule, an effective advising of *Miranda* rights does not require an oral recitation, and presentation to a defendant of a written form which adequately lists his rights is sufficient." *People v. Nantelle,* 130 Mich.App. 51, 342 N.W.2d 627, 628 (1983); *see also United States v. Sledge,* 546 F.2d 1120, 1122 (4th Cir.1977); *United States v. Coleman,* 524 F.2d 593 (10th Cir.1975); *United States v. Bailey,* 468 F.2d 652, 659 (5th Cir.1972).

that [s]he knew what [s]he gave up when [s]he spoke." *Id.*

Nevertheless, the Appellant argues her waiver was not knowing because her initial waiver was not made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon them." *Matthews v. Commonwealth*, 168 S.W.3d 14, 21–22 (Ky. 2005). However, at the time of the polygraph examination the Appellant was fully aware of, because of the form, what rights she had, when she could assert those rights, and what rights she was giving up by continuing with the polygraph examination. She had to be aware that when she answered the polygraph questions, and later answered the detectives' questions, that she was making incriminating statements, especially given that the form stated that her statements could be used against her in a court of law. Indeed, the nature of an implied waiver—depending as it does on the defendant's knowledge of her rights and action inconsistent with an exercise of those rights—necessarily makes it a knowing waiver. (This is made clear by the fact that the Supreme Court answered both questions simultaneously in *Thompkins.*) The Appellant had "full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [those rights]" at the time she made her initial, albeit implied, waiver. *Id.* at 21.

As to the voluntariness of the Appellant's waiver, there is no evidence that the Appellant was intimidated, coerced or deceived into making her initial waiver. Indeed, the record reflects the opposite. The Appellant voluntarily accompanied and consented to the polygraph examination. There is a complete absence of proof of any threats or duress. Further, the form the Appellant signed stated, "I, Kathleen Wise, voluntarily—without threats, duress, coercion, force . . . agree and stip-

ulate to take a polygraph examination." The Court finds no evidence to suggest that the Appellant's initial waiver was anything other than voluntary.

We find nothing from the record to indicate that under the "totality of the circumstances," *id.* at 21–22, that the Appellant's decision to take the polygraph examination and waive her *Miranda* rights was unknowing or involuntary.

### 2. *Post–Polygraph Questioning*

The next question is whether the Appellant's initial waiver was sufficient to constitute a waiver of her rights for the duration of her post-polygraph interviews. The Appellant contends that the form she signed prior to the polygraph examination was a limited waiver of rights restricted to the administration of the polygraph examination itself, and thus it did not apply to any post-examination questioning. The Appellant's post-polygraph questioning involved two different interviews during two different time periods: the interview with Detective Bratcher immediately following the administration of the polygraph itself where the Appellant confessed for the first time, and the subsequent interview with Taylor County deputies during which the Appellant provided further details about the murder of her husband.

At the outset, the Court finds it important to re-emphasize that the form signed by the Appellant was not a waiver, but only an advisement of her rights. The waiver by the Appellant came from her deliberate and continuing choice to act in a manner inconsistent with her rights once she had been advised of them. Functionally, because the waiver was not express, the Appellant continued to waive her rights by not asserting them and by acting inconsistently with an assertion of those rights. This undermines the Appellant's argument that she only invoked a limited waiver of her rights. The Appellant's *im-*

*plied* waiver could only be limited by her actions. That she chose not to limit it was shown by her continuing to make statements to the police after she had been advised of her rights.

Because this Court finds that the Appellant knowingly and voluntarily waived her *Miranda* rights prior to each interview, we hold that the trial court did not err in denying her motion to suppress. We will discuss each interview and accompanying waiver in turn.

### a. First Post–Polygraph Interview

■ The Court concludes that the Appellant waived her *Miranda* rights as to the statements she made to Detective Bratcher, the polygraph examiner, because his post-polygraph questioning was part of the polygraph examination and the implied waiver therefore extended to the additional questioning. In *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), the U.S. Supreme Court was presented with nearly identical circumstances and had to decide whether a criminal defendant's initial waiver of *Miranda* rights extended to post-exam questioning by the polygraph examiner. In that case, the defendant took a polygraph examination as part of a rape investigation. *Id.* at 44, 103 S.Ct. 394. Prior to the examination, he signed a written consent document containing an advisement of a polygraph examinee's *Miranda* rights. *Id.* After the polygraph examination, the examiner informed the defendant that his answers to some of the questions indicated deception and asked if he would like to further explain his answers. *Id.* at 45, 103 S.Ct. 394. The defendant then admitted to having committed the rape. *Id.*

On appeal, the defendant argued that he had not knowingly or voluntarily waived his *Miranda* protections because the waiver he signed did not contemplate post-examination questioning. *Id.* In rejecting this argument, the U.S. Supreme Court

dissected the argument of the lower court, stating:

> The Court of Appeals relied on two facts indicating the need for a new set of warnings: the polygraph examination had been discontinued, and Fields was asked if he could explain the test's unfavorable results. To require new warnings because of these two facts is unreasonable. Disconnecting the polygraph equipment effectuated no significant change in the character of the interrogation. The CID agent could have informed Fields during the examination that his answers indicated deceit; asking Fields, after the equipment was disconnected, why the answers were bothering him was not any more coercive.

*Id.* at 47, 103 S.Ct. 394.

The Court noted that even if the defendant and his attorney did not have any indication that the post-questioning might occur, "it would have been unreasonable for [the defendant] and his attorneys to assume that [the defendant] would not be informed of the polygraph readings and asked to explain any unfavorable result." *Id.* Moreover, the Court found that "the questions put to [the defendant] after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before," *id.* at 48, 103 S.Ct. 394, and to require a second *Miranda* warning prior to his questioning about the deceptive polygraph results would "simply [be] an unjustifiable restriction on reasonable police questioning." *Id.* Courts in other jurisdictions have similarly adopted the same rule. *See United States v. Little Bear,* 583 F.2d 411 (8th Cir.1978); *Keiper v. Cupp,* 509 F.2d 238 (9th Cir.1975); *State v. Henry,* 352 So.2d 643 (La.1977).

Given its nearly identical factual circumstances, the Supreme Court's rule in *Wyrick* applies here as well. The questioning

by Detective Bratcher immediately after the polygraph examination was not sufficiently separated in time from the administration of the examination itself to remove it from the scope of the Appellant's initial waiver. This Court agrees that it is unreasonable for the Appellant to disclaim an expectation of questioning after an unfavorable polygraph result, which is a foreseeable risk of taking a polygraph examination.

Nor was there a "change in circumstances" so serious as to render the Appellant's initial waiver no longer knowing or voluntary. *Wyrick*, 459 U.S. at 46, 103 S.Ct. 394. The Appellant was questioned by the same person who administered the examination in the same room as she took the examination. There was no significant time delay between the conclusion of the exam and the post-polygraph questioning. The record indicates that from the time the polygraph exam began to the time Detective Bratcher completed his polygraph-examination report, including the post-examination questioning with Detective Bratcher, was approximately two hours. As in *Wyrick*, we see no reason the Appellant would have "forg[otten] the rights of which [s]he had been advised and which [s]he had understood moments before." *Id.* at 48, 103 S.Ct. 394.

 Moreover, the Appellant's continued answering of questions after the examination—and after having been informed of her rights at the beginning of the examination—was itself an implied waiver of her *Miranda* rights. As discussed above, she understood her rights and acted inconsistently with an exercise of those rights. Such conduct is a knowing and voluntary implied waiver.

As such, this Court finds that the Appellant knowingly and voluntarily waived her *Miranda* rights as to the post-polygraph interview with Detective Bratcher.

### b. Second Post–Polygraph Interview

 The Appellant also argues that the trial court erred in admitting her statements to Taylor County deputies following her post-polygraph interview with Detective Bratcher. The Taylor County deputies had been watching the polygraph examination and subsequent questioning, and heard her confess to killing her husband. A few minutes after her interview with Detective Bratcher ended, she was moved to a different room. She argues that she was not sufficiently advised of her *Miranda* rights prior to the second interview and, even if she were, she did not expressly or impliedly waive those rights because in her mind she was deceived into waiving her rights initially and did not know about the post-examination questioning before making her initial waiver. But we cannot say, under the "totality of the circumstances," that the trial court erred in admitting her statements.

Before asking any substantive questions, one of the Taylor County deputies pointed to the form the Appellant had signed and asked if it was her signature on it. She indicated that it was. Certainly the deputy could have been more direct in advising her of the *Miranda* rights provided in the form, but his drawing the Appellant's attention to the form she had signed a short time before was sufficient to remind her of the contents of that form. The Appellant's claim that she did not know her rights at that time is thus unconvincing.

The form provided that the Appellant could exercise her rights any time while she was at the police station. Detective Bratcher told her that she would be questioned by other officers in a different room, which occurred no more than two minutes after her interview with him finished. She was also aware that the polygraph examination would be viewable by closed-circuit television and acknowledged as much by signing the form. As with the

post-interview questioning by Detective Bratcher, nothing in the record suggests that circumstances were so changed in the short time between the polygraph examination and the interview by the Taylor County deputies as to "cause[ ] [the Appellant] to forget the rights of which [s]he had been advised and which [s]he had understood moments before." *Fields*, 459 U.S. at 49, 103 S.Ct. 394. It is simply unreasonable to suggest that the Appellant was unaware of her *Miranda* rights.

As with her initial waiver, the Appellant's conduct during the interview with the Taylor County deputies indicates that she impliedly waived her *Miranda* rights. The entire process from the beginning of the polygraph examination until Detective Bratcher filed his report took two and a half hours. At no point did the Appellant indicate that she did not want to speak to any of the investigating officers, even when she was reminded of the form she had signed containing her rights. Her continuing to answer questions, despite knowing she had a right not to do so, was inconsistent with an exercise of her *Miranda* rights, and there was no evidence of coercion or duress. The Appellant therefore waived her rights and did so knowingly and voluntarily. For that reason, this Court finds that the trial court did not err in admitting her statements to Taylor County deputies.

The Appellant also argues that she was deceived into waiving her *Miranda* rights because she was not told about the possibility of post-examination questioning and that both the form and examination itself were ruses to get her to waive her rights for questioning, in the Appellant's view, that was inevitably to follow the exam, unbeknownst to her. By this, the Appellant is implying that she was somehow coerced by this behavior or that its allegedly deceptive nature undermined the knowingness of her waiver. But the cir-

cumstances here certainly do not rise to the level of that which the Supreme Court has suggested could be coercive. *See, e.g., Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (holding that the employment of a ruse, or "strategic deception," does not render a confession involuntary so long as the ploy does not rise to the level of compulsion or coercion); *Moran v. Burbine*, 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding that the withholding of information by police is relevant to the validity of a waiver only if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them).

The simple fact is that the Appellant's conduct—answering police questions—was inconsistent with an exercise of her *Miranda* rights. Whatever deception may have been intended by the deputies, if any, does not undermine this. The Appellant had been informed of her rights and she waived them again, separate from her initial waiver for the polygraph, by answering additional questions about her husband's murder.

This argument is really just an extension of the Appellant's claim that the polygraph form she signed was at most a limited waiver of her rights. But, as addressed above, she waived her rights not by the form she signed but by her conduct, which she engaged in with full knowledge that she had the right to silence.

This Court finds nothing from "totality of the circumstances" to show that the Appellant did not knowingly and voluntarily waive her rights as to her second post-polygraph interview with police. For that reason, the trial court did not err in admitting the Appellant's statements to the Taylor County deputies.

## B. Lesser–Included Instruction

At trial, the Appellant was charged with one count of murder. At the close of evidence, the jury was instructed on intentional murder and wanton murder, as well as the lesser-included offenses of second-degree manslaughter and reckless homicide. On appeal, the Appellant argues that she was entitled to an instruction on the lesser-included charge of first-degree manslaughter. The Appellant concedes that this argument was not preserved for appellate review per the requirements of Criminal Rule 9.54(2) [5] and requests that we examine it for palpable error pursuant to Criminal Rule 10.26.[6]

Under Criminal Rule 10.26, an unpreserved error may only be corrected on appeal if the error is both "palpable" and "affects the substantial rights of a party" to such a degree that it can be determined "manifest injustice resulted from the error." For error to be palpable, "it must be easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). The rule's requirement of manifest injustice requires "showing . . . [a] probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006). Or, as stated elsewhere in that decision, a palpable error is where "the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4. Ultimately, "[m]anifest injustice is found if the error seriously affected the fairness, integrity, or public reputation of the proceeding." *Kin-*

*grey v. Commonwealth*, 396 S.W.3d 824, 831 (Ky.2013) (quoting *McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky. 2012)).

This Court directly addressed the issue of unpreserved allegations of instructional error as discussed by Criminal Rule 9.54(2) and the concept of palpable error review in *Martin v. Commonwealth*, 409 S.W.3d 340 (Ky.2013). Acknowledging the seeming tension between past decisions and the language of both Criminal Rule 10.26 and 9.54(2), the Court concluded: "Although palpable error under RCr 10.26 may be available for certain kinds of instructional error, . . . RCr 9.54(2) bars palpable error review for unpreserved claims that the trial court erred in the giving or the failure to give a specific instruction." *Id.* at 345.

In reaching its conclusion, the Court reasoned that it was the duty of the trial court in a criminal case to instruct the jury "on the whole law of the case and this rule requires instructions applicable to every state of the case deducible or supported to any extent by testimony." *Id.* (quoting *Swan v. Commonwealth*, 384 S.W.3d 77, 99 (Ky.2012)). A criminal defendant is entitled to "have every issue of fact raised by the evidence and material to the defense submitted to the jury on proper instructions." *Id.* (quoting *Thomas v. Commonwealth*, 170 S.W.3d 343, 349 (Ky. 2005)). However, the Court ultimately reasoned that "RCr 9.54(2) puts the burden on the parties to make their instruc-

---

5. Criminal Rule 9.54(2) states:

No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.

6. Criminal Rule 10.26 states:

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

tional preferences known to the trial judge." *Id.* Thus, the Court reiterated that "[i]t is not an error, ... palpable or otherwise, for the trial court not to instruct on a lesser included offense that had not been requested." *Id.* (quoting *Bartley v. Commonwealth*, 400 S.W.3d 714, 731 (Ky.2013)).

 Nevertheless, the Court distinguished a defendant's failure to request or oppose the giving of an instruction from an unpreserved assignment of error "that the instruction given was incorrectly stated." *Id.* at 346. In other words, a defendant cannot rely on the palpable-error rule to complain about the *absence* of an instruction that was never requested (and thus was not given) or that was not objected to (and was given), but that rule is still available when the defendant belatedly complains about the content of an instruction that was given.

The Appellant concedes in her brief that the issue of instructional error was not preserved for appellate review. Indeed, the trial record discloses that no jury instructions were tendered by the Appellant, much less a specific instruction on first-degree manslaughter. Nor did the Appellant ask for such an instruction. Thus, under the rule in *Martin*, the trial court's failure to give an instruction on first-degree manslaughter was not properly preserved and is not subject to palpable-error review.

### III. Conclusion

For the foregoing reasons, the judgment of the Taylor Circuit Court is affirmed.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, and SCOTT, JJ., concur. VENTERS, J., concurs in result only by separate opinion in which KELLER, J., joins.

VENTERS, J., Concurs in Result Only.

I concur in result only. The *Miranda* warnings informed Appellant only that she had the right to remain silent and the right to an attorney during the polygraph exam. They did not adequately apprise her of applicability of those rights during the subsequent police interrogation. Therefore, while Appellant's confession to the polygraph examiner was properly admitted, her subsequent statements to police detectives should have been suppressed. Nevertheless, the error was harmless because the confession to the polygrapher was so damning that the improperly admitted statements could have had no prejudicial effect.

KELLER, J., joins.