**Raymond HARRIS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2008–SC–000363–MR.

Supreme Court of Kentucky.

May 20, 2010.

Thomas More Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Bryan Darwin Morrow, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Raymond Harris appeals from a May 5, 2008 Judgment of the Bell Circuit Court convicting him in accord with the jury's verdict of Murder, in violation of KRS 507.020; of complicity to second-degree arson, in violation of KRS 513.030; and of two counts of complicity to tampering with physical evidence, in violation of KRS 524.100. The trial court sentenced Harris to life in prison without the possibility of parole for twenty-five years for the murder, and to concurrent prison terms of ten, five, and five years for the arson and tampering offenses respectively. The Commonwealth alleged that in March 2002, Dwayne Harris, Raymond Harris's nephew, hired Raymond to kill Paul Browning. The two Harrises, together with a third man, Johnny Epperson, were alleged to have taken Browning to a secluded area in Bell County, where Raymond Harris shot and killed him. The three conspirators then attempted to cover up the crime by

placing Browning's body in Browning's pickup truck and setting the truck on fire and by throwing the murder weapon into the Cumberland River. Harris's principal claims on appeal concern jury selection, during which, Harris maintains, the trial court erred by refusing to dismiss several potential jurors allegedly biased in favor of the death penalty, by dismissing three potential jurors who stated that they could not impose that penalty, and by permitting a married couple to sit on the jury. He also maintains that he was entitled to a directed verdict and that the trial court erred by refusing to instruct the jury with respect to voluntary intoxication and second-degree manslaughter. Finding no error, we affirm.

## RELEVANT FACTS

The Commonwealth's case rested principally on the testimonies of Dwayne Harris and Johnny Epperson. They presented a picture of drug dealing and police corruption in Harlan County. According to the two men, for some years prior to 2002 Dwayne Harris had sold large quantities of illegal drugs from a sports memorabilia store he and his wife operated in the Fairview section of Harlan. During that time, Epperson, a cocaine addict, performed odd jobs for Harris in exchange for cocaine. Harris was also assisted by Roger Hall, a deputy in the Harlan County Sheriff's office. In exchange for a share of Harris's drug proceeds, Hall supplied him with inside information about federal and state, as well as county, drug interdiction efforts and helped transport drugs into Harlan County.

In 2002, the security of Dwayne Harris and Hall's operation was threatened by the upcoming County Sheriff election. Paul Browning, who had served as Sheriff of Harlan County in the early 1980s, was again seeking election to that office. To protect their illegal trade in the event of Browning's election, Dwayne Harris and Hall set out to acquire "leverage," as they called it, over Browning. Dwayne Harris approached Browning and offered to help finance his campaign in exchange for Browning's cooperation, an offer Browning accepted. Lest he renege once in office, Dwayne Harris and Hall secretly video taped Browning making incriminating statements and accepting money from Harris, with the intent of using the tapes to blackmail Browning if need be.

At one of his meetings with Dwayne Harris, Browning stated that were he elected he intended to replace Hall with a deputy of his own choosing. At that point Dwayne Harris and Hall concluded that notwithstanding their "leverage" over him, Browning posed an unacceptable risk to their operation, and they decided to have him killed. Eventually they offered to pay Dwayne's uncle, Raymond Harris, $1,000.00 for the killing. Raymond Harris was unemployed at the time, his disability benefits had been cut off, and he had a drinking problem. He agreed to kill Browning.

Dwayne Harris convinced Browning to accompany him to Middlesboro on March 22, 2002, ostensibly for dinner and to discuss Browning's campaign. Epperson and Raymond Harris also made the trip. The four men left Harlan in the late afternoon, the two Harrises riding in Dwayne's pickup truck, and Epperson riding with Browning in Browning's truck. The plan, according to Dwayne Harris and Epperson, was to kill Browning outside of Middlesboro, to bury the body there, and to burn Browning's pickup truck at another location. Instead, as the men were riding through Bell County, Dwayne Harris pulled off Highway 119 onto a secluded stretch of Highway 987 in order to urinate. Browning pulled in behind, and Epperson joined Dwayne in front of Dwayne's truck

where he too urinated. As they were so engaged, they heard a bang and in short order discovered that Raymond had shot and killed Browning.

Raymond and Epperson placed Browning's body back in his truck, and, with Epperson driving Browning's truck, the three men headed back toward Harlan. Before leaving Bell County, however, Dwayne again detoured from Highway 119 and led the way to a mining road off of Highway 2012. There, according to Epperson, Raymond threatened to shoot him if he did not douse Browning's truck and the body with gasoline and set them on fire, which he did. Before returning to Harlan, Dwayne drove to the Dayhoit bridge, from which Epperson threw the murder weapon into the river. Shortly after the men arrived back in Harlan, Dwayne gave Raymond the promised $1,000.00. It was not until 2004, when Dwayne and Epperson faced federal prosecution for drug trafficking, that they gave statements implicating Raymond in Browning's murder.

In addition to Dwayne Harris's and Epperson's testimony, the Commonwealth's proof included evidence showing that within a week of the murder Raymond moved from Harlan to Lexington, where he stayed for some months before returning to Harlan; the testimony of two witnesses, Edna Tackett and Richard Harris, who claimed that Raymond had admitted, indeed boasted of, the killing; and Tackett's further testimony that on the night of the killing, in its immediate aftermath, she had seen Raymond with a large amount of cash in his hand and with his skin blackened from smoke.

Raymond maintained and through cross-examination attempted to show that Dwayne and Epperson were not credible

and were framing him for their own crimes. He also presented testimony to the effect that in March 2002 he was an active alcoholic and had drunk heavily on the day of Browning's murder.

As noted, the jury rejected Raymond's defense and found him guilty of murder and the other charged offenses. It also found as an aggravating circumstance that Raymond committed the murder for profit. KRS 532.025(2)(a)(4). It then recommended a sentence of life without the possibility of parole for the aggravated murder, and concurrent sentences of ten, five and five years, respectively, for the complicity to arson, and the two complicity to tampering with evidence offenses. The trial court ultimately sentenced Harris as noted above.

On appeal, Harris's[1] first, and main, contentions are that the trial court abused its discretion during jury selection (A) by refusing to strike six jurors who either could not consider the full range of authorized penalties or could not give the necessary consideration to mitigating circumstances; (B) by striking three jurors who expressed an inability to impose the death penalty; and (C) by permitting a married couple to serve on the jury. We are convinced that there was no abuse of discretion and that Harris's other alleged errors provide no grounds for reversal.

## ANALYSIS

### I. The Trial Court Did Not Abuse Its Discretion During Jury Selection.

**A. The Trial Court Did Not Abuse Its Discretion By Refusing To Strike Certain Jurors Who Expressed Pro–Death–Penalty Attitudes.**

■ Harris was charged with capital murder, and the Commonwealth sought

---

1. Appellant Raymond Harris is hereafter referred to as "Harris." Others with that surname will be referred to by their full names.

the death penalty against him. Accordingly, the trial court, during individual voir dire, explained to each potential juror that if the jury found the defendant guilty of that crime it would be asked to decide upon one of the five authorized penalties, a range of penalties extending from a minimum of twenty years in prison all the way to death. The court then asked if the juror would be capable of considering that full range of punishments. When the court finished with its questioning, defense counsel was permitted to inquire more specifically into the potential juror's attitude toward the death penalty and was also permitted to ask each potential juror to consider a hypothetical murder, a sort of generic capital homicide: an intentional murder of a blameless victim, a murder unjustified in any way by fear or passion, and a murder committed in conjunction with some aggravating circumstance, such as a robbery or a rape. Counsel was permitted to ask each potential juror whether he or she could consider the full range of penalties for such a murder. Counsel was also permitted to ask the potential jurors whether they would take mitigating circumstances into consideration, and in particular whether they would regard certain factors, such as the defendant's age, lack of criminal history or domination by another person, as mitigating.

In light of their responses to these inquires, Harris moved to have struck for cause potential jurors 23, 26, 29, 31, 53, and 86. The trial court denied those motions, whereupon Harris used peremptory challenges against five of them and otherwise exhausted his peremptory challenges.

Although none of the five peremptorily struck jurors at issue sat on Harris's jury, if any of them should have been struck for cause, Harris would be entitled to relief because in that event he was denied the full use of his peremptory challenges. *Shane v. Commonwealth,* 243 S.W.3d 336 (Ky.2007).[2]

Harris did not use a peremptory strike against juror 29, and she sat on the jury. Generally, a biased juror taints the proceeding and, if properly objected to, the presence of such a juror on the jury will entitle the defendant to relief. *United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). Here, however, the bias alleged against juror 29 is bias in favor of capital punishment. The United States Supreme Court has indicated that the only relief mandated for the improper inclusion or exclusion of potential jurors on the basis of their attitudes toward capital punishment is relief from a capital sentence. *Witherspoon v. Illinois,* 391 U.S. 510, 523 n. 21, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (*Witherspoon* violation does not "affect the validity of any sentence other than one of death."). Because Harris was not sentenced to death, he is not entitled to relief even if juror 29 were biased in favor of that punishment. As discussed below, moreover, she was not biased as alleged.

██ Seeking *Shane* relief, however, Harris maintains that the trial court's refusal to strike these jurors infringed his right under our rules to the full use of his peremptory challenges. We consider, therefore, whether any of them should have been so struck. We review the trial

**2.** We note that in *Gabbard v. Commonwealth,* 297 S.W.3d 844 (Ky.2009), we refined the holding of *Shane* to require, in addition to the exhaustion of peremptory challenges, a showing that the party identified a juror or jurors who would have been stricken but for the error and further, that a juror the party desired to strike actually sat on the jury. Because none of the challenged jurors should have been struck for cause, we need not decide whether *Gabbard,* a 2009 case, applies to Harris's 2008 trial.

court's rulings on motions to strike for abuse of discretion, *Soto v. Commonwealth,* 139 S.W.3d 827 (Ky.2004), and are convinced that no abuse of discretion occurred.

 As Harris correctly notes, the United States Supreme Court has held that under the Eighth and Fourteenth Amendments to the United States Constitution a capital defendant is entitled to an individualized sentencing by a jury allowed to consider and to give effect to any mitigating evidence that the defendant can produce. *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In furtherance of that right, the Court has also held that such a defendant is entitled to have removed for cause any potential juror so biased in favor of the death penalty that his ability to consider lesser penalties is substantially impaired. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). A juror who, having found the defendant guilty of a capital crime, would automatically vote for that penalty regardless of any mitigating evidence is thus disqualified. Such a juror, the Court explained,

> will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.

*Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). A potential juror should be disqualified, therefore, who would automatically impose the death penalty without regard to mitigating circumstances or whose ability to consider penalties other than capital punishment is substantially impaired. Accordingly, we have many times held that "[a] capital defendant is entitled to a jury that can fairly consider the entire range of punishments." *Fields v. Commonwealth,* 274 S.W.3d 375, 393 (Ky.2008) (citation omitted).

When asked initially by the trial court whether they could consider the full range of authorized penalties, the jurors Harris now objects to all stated that they could. In response to Harris's questions, however, these jurors indicated that they favored the death penalty for certain crimes. Juror 26, for example, stated that he had a law enforcement background and regarded the intentional killing of a police officer as a particularly serious crime for which the death penalty would be appropriate. This juror even remarked that for certain crimes, if the court instructed him to he would consider all penalties including "stoning or burning at the stake." Juror 23 believed the death penalty was justified on the basis of "an eye for an eye." Jurors 53 and 86 both thought the death penalty sometimes appropriate to prevent murderers from returning to the community, and juror 86 regarded the intentional killing of a child as the sort of crime for which the death penalty might be appropriate.

 Harris maintains that these jurors' pro-death-penalty attitudes disqualified them, but "[a] trial court is not required to excuse a juror for cause merely because the juror favors severe penalties, so long as he or she can consider the full range of penalties." *Soto v. Commonwealth,* 139 S.W.3d at 849. Nor, again, is a juror disqualified merely for espousing the "eye for an eye" belief, if the juror otherwise

gives assurance that he or she can consider the penalties other than death. *Id.* at 849. Although these jurors favored severe penalties for the crimes they regarded as particularly serious, they all indicated that not every murder deserved the death penalty. Notwithstanding his "burning at the stake" remark, juror 86 emphasized that he believed in the presumption of innocence, and, as did the rest of these jurors, stated numerous times that he could and would consider the full range of penalties and all the circumstances of the case. The trial court did not abuse its discretion, therefore, by deeming these jurors qualified.

■ This conclusion is not undermined by the fact that in response to Harris's dire hypothetical—an aggravated, cold-blooded, and otherwise unexplained murder—some of the jurors stated that they probably would not, for such a crime, consider one of the lesser penalties. It is telling that these jurors, when asked if they could consider the full range of penalties for counsel's hypothetical murder, all stated that they were not sure, that it would depend on the circumstances, that they needed more information. Only when counsel pushed them to assume an aggravated crime with no explanation, did juror 31, for example, doubt that he would impose a sentence less than life without parole. A juror is not disqualified, however, merely because he or she "find[s] it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Stopher v. Commonwealth,* 57 S.W.3d 787, 797 (Ky.2001);

*Walker v. Commonwealth,* 288 S.W.3d 729 (Ky.2009). Notwithstanding some of these jurors' reluctance to apply a lesser punishment to counsel's severe hypothetical crime, each of them indicated both the ability and the willingness to consider all of the evidence and all of the authorized penalties and to render an impartial verdict.

Finally, none of these jurors was disqualified because of an unwillingness to consider mitigating evidence. As noted above, in cases such as *Penry, Eddings,* and *Morgan,* the United States Supreme Court has held that a capital defendant is entitled to present mitigating evidence to the jury, that the jury must be allowed to give effect to that evidence if it is so inclined, and that a juror who would give no effect to any mitigating evidence but would always vote to impose the death penalty for a capital crime is disqualified. There is no entitlement, however, to a jury or to individual jurors committed at the outset to view particular mitigating factors as having a mitigating effect. *Walker, supra* (lack of significant criminal history); *Winstead v. Commonwealth,* 283 S.W.3d 678 (Ky.2009) (poverty and difficult family life); *Fields, supra* (intoxication); *Sherroan v. Commonwealth,* 142 S.W.3d 7 (Ky. 2004) (troubled background); *Stopher, supra* (voluntary intoxication). Jurors 26, 29, and 86 were not disqualified, therefore, merely because they stated that particular factors, such as lack of a significant criminal history or domination by another person (juror 26); low IQ, an abusive childhood, or the lack of a significant criminal record (juror 29); youth, an abusive childhood, or intoxication (juror 86); were facts not likely to have much bearing on their penalty decisions. Each of these jurors indicated that there were circumstances in which even an aggravated murder would warrant a penalty other than death, that he or she would consider the evidence

offered in mitigation, and that his or her penalty decision would be based not only on the crime but on its circumstances as well. Notwithstanding their rejection of particular mitigating factors, therefore, these jurors were not shown to be so thoroughly unreceptive to mitigation evidence or so substantially impaired in their ability to consider penalties other than death as to be disqualified.

**B. The Trial Court Did Not Abuse Its Discretion By Excusing Three Jurors Who Expressed An Inability To Consider The Death Penalty.**

 Harris next contends that the trial court abused its discretion under RCr 9.38 when it dismissed three potential jurors who indicated during individual voir dire that their reservations about the death penalty would not in all cases prevent them from considering that punishment, but who then during general voir dire stated that upon further reflection they had become convinced that they could not impose the death penalty under any circumstances. Harris correctly notes that the rule mandates individual voir dire for questions regarding capital punishment and requires the trial judge to permit the parties' attorneys to conduct the examination on that issue. Here, the parties had been accorded a full opportunity during individual voir dire to canvass the jurors' attitudes toward the death penalty, but that issue arose again during general voir dire when, in response to a question posed by the Commonwealth regarding the jurors' ability to "judge another person," a juror volunteered that while she would not have a problem deciding on another person's guilt, she was deeply troubled by the death penalty and had decided since her examination during individual voir dire that she simply could not impose that punishment. Two other jurors then said that they, too, had had second thoughts about the death penalty and did not think that

they could impose it. The trial court thereupon granted the prosecution's motion to dismiss these three jurors and denied Harris's request for additional individual voir dire. Harris acknowledges that a potential juror "who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause." *Uttecht v. Brown,* 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (citation omitted). He contends nevertheless that under RCr 9.38 the trial court was obliged to give him an additional opportunity to question each of these jurors individually.

It may well be that when the question of capital punishment arose unexpectedly during general voir dire, the better practice would have been for the trial court to canvass the affected jurors individually and to permit counsel to question them. Harris did not object, however, until after the jurors had been questioned as a group and the three jurors had made their feelings known. In these circumstances, we cannot say that the trial court abused its discretion by dismissing the jurors whose ability to consider the death penalty was clearly substantially impaired or by determining that additional questioning would not undo the impairment the jurors had displayed. As the Commonwealth correctly points out, moreover, and as discussed above, because Harris was not sentenced to death, *Witherspoon,* 391 U.S. at 523 n. 21, 88 S.Ct. 1770 (*Witherspoon* violation does not "affect the validity of any sentence other than one of death.") and because the court's alleged error did not compromise his use of peremptory strikes, *Shane, supra,* he could not have been prejudiced by an error that bore only upon a capital sentence. The error, therefore, if any, was harmless and does not entitle Harris to relief.

## C. The Trial Court Did Not Abuse Its Discretion By Permitting A Married Couple To Serve On The Jury.

 Finally with respect to jury selection, Harris contends that the trial court abused its discretion by permitting a married couple to sit on the jury. Following individual voir dire and prior to the commencement of general voir dire, Harris noted that the remaining panel included two married couples, jurors 28 and 29, and another couple. Arguing that these jurors would not be independent but would unduly influence each other and also that they would find it difficult not to discuss the case as it was proceeding, Harris moved to have one member of each couple randomly selected and dismissed. The trial court denied the motion at that point in time, ruling instead that the couples could be questioned and if their answers confirmed Harris's concerns one member of the couple could then be removed. During general voir dire, Harris referred to these couples and asked them whether they would not find it difficult to refrain from discussing the case as it was going on. Both couples gave assurance, however, that they would be able to abide by the admonition not to discuss the case. Harris did not ask these couples whether they would be apt to influence each other, he did not renew his objection at the end of voir dire, and he did not remove either juror 28 or 29 peremptorily. Both served on the jury. Harris now contends that married jurors are presumptively not independent and that his right to an impartial jury was thus violated by the presence of a married couple on his jury.

Harris is correct, of course, that under the Sixth and Fourteenth Amendments to the United States Constitution and Section 11 of the Kentucky Constitution, a criminal defendant is entitled to an impartial jury. To help protect that right, RCr 9.36 mandates that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." In making this determination, the trial court is to consider the prospective juror's voir dire responses as well as his or her demeanor during the course of voir dire, and is to keep in mind that generally it is the totally of those circumstances and not the response to any single question that reveals impartiality or the lack of it. "Impartiality," we reiterated recently in *Shane, supra,* "is not a technical question but a state of mind." 243 S.W.3d at 338. Indeed, we have held that notwithstanding a prospective juror's responses during voir dire, whatever his or her protestations of lack of bias, the juror's close relationship, "be it familial, financial or situational, with any of the parties, counsel, victims or witnesses," is sufficient to require the court "to sustain a challenge for cause and excuse the juror." *Marsch v. Commonwealth,* 743 S.W.2d 830, 833 (Ky.1988) (citing *Ward v. Commonwealth,* 695 S.W.2d 404 (Ky.1985), internal quotation marks omitted); *Montgomery v. Commonwealth,* 819 S.W.2d 713 (Ky.1991). This is so, we explained, because however sincere and well meaning such prospective jurors may be, such close personal relationships are apt "subconsciously [to] affect their decision in the case." *Marsch,* 743 S.W.2d at 834. *See also, Ratliff v. Commonwealth,* 194 S.W.3d 258 (Ky.2006) (collecting cases in which we have held that bias should have been presumed).

 Bias, however, presumptive or otherwise, refers generally to a juror's favoring or disfavoring one side of the case or the other, a risk not posed by relationships between jurors. For that reason, the few courts to have addressed in published opinions the issue of married jurors

have held that such jurors are not presumptively disqualified and that their independence may be adequately assured through voir dire. *See for example, State v. Richie,* 88 Hawai'i 19, 960 P.2d 1227 (1998); *Russell v. State,* 560 P.2d 1003 (Okla.Crim.App.1977); *State v. Wilkins,* 115 Vt. 269, 56 A.2d 473 (1948); *Savoie v. McCall's Boat Rentals, Inc.,* 491 So.2d 94 (La.App.1986). We agree that no presumption of undue influence or lack of independence arises from the fact of marriage alone. While a trial court would be within its discretion to avoid even the possibility of impropriety posed by married jurors by dismissing one or the other, the trial court did not abuse its discretion here by postponing its decision on Harris's motion to dismiss until after the married jurors had been questioned. Harris's failure to renew his motion after voir dire in effect waived the issue, but in any event, since the jurors' responses included nothing that would have compelled a dismissal, the trial court cannot be said to have abused its discretion by permitting jurors 28 and 29 both to serve on Harris's jury.

## II. Harris Was Not Entitled To A Voluntary Intoxication Instruction.

Harris next contends that the trial court erred when it denied his request for jury instructions on the defense of voluntary intoxication and the concomitant lesser offense of second-degree manslaughter. The trial court denied the request because in its judgment the evidence that the attack had been planned and the fact that Browning had been shot in the back of the head, suggesting a deliberate assassination, did not permit a finding of wantonness. We review a trial court's decision not to give an instruction under the abuse of discretion standard. *Crain v. Commonwealth,* 257 S.W.3d 924 (Ky.2008).

As Harris correctly notes, a trial court is required to instruct the jury on affirmative defenses and lesser-included offenses if the evidence would permit a juror reasonably to conclude that the defense exists or that the defendant was not guilty of the charged offense but was guilty of the lesser one. *Fredline v. Commonwealth,* 241 S.W.3d 793 (Ky.2007); *Fields v. Commonwealth,* 219 S.W.3d 742 (Ky.2007). It is equally well established that such an instruction is to be rejected if the evidence does not warrant it. *Payne v. Commonwealth,* 656 S.W.2d 719 (Ky. 1983). Under KRS 501.080(1), voluntary intoxication is a defense to a criminal charge only if the intoxication "[n]egatives the existence of an element of the offense." Intent is the element of murder that voluntary intoxication can conceivably negate, and if it does the offense is reduced from murder to second-degree manslaughter. *Caudill v. Commonwealth,* 120 S.W.3d 635 (Ky.2003). Harris maintains that he was thus entitled to a second-degree manslaughter instruction, because the jury could have believed that he was too intoxicated to form the intent to kill Paul Browning. We have interpreted KRS 501.080(1), however, "to mean that the [voluntary intoxication] defense is 'justified only where there is evidence reasonably sufficient to prove that the defendant was so drunk that he did not know what he was doing.'" *Fredline,* 241 S.W.3d at 797 (quoting from *Rogers v. Commonwealth,* 86 S.W.3d 29, 44 (Ky.2002)). The trial court did not abuse its discretion by rejecting that defense here.

Harris presented evidence to the effect that in March 2002 he was an active alcoholic, and three witnesses testified that on the day of Browning's murder they observed Harris in a drunken state. Two of those witnesses testified that shortly after noon they saw Harris walking along the railroad tracks as he often did when

drunk, talking to himself, waving his arms, and apparently oblivious to his surroundings. The third witness, Harris's son-in-law, testified that he visited Harris at his apartment between 3:30 and 4:00 that afternoon in hopes of borrowing some money. He found Harris drinking beer and intoxicated to the extent that his speech was slurred. Harris was apparently not so drunk that he did not know what he was doing, however, for he understood his son-in-law's errand well enough to loan him ten dollars. A fourth witness testified that she encountered Harris later that night, after the murder. She too described Harris as intoxicated, but testified that Harris was in possession of a large amount of cash, that his skin appeared blackened as if from smoke, and that he said to her, "See baby, don't tell me I don't care to kill somebody."

Otherwise, the only evidence of Harris's condition at the time of the offense came from Dwayne Harris and Epperson, who were not asked whether Harris was intoxicated. They testified that, in accord with the plan to murder Browning, Harris had joined the group that afternoon armed with a gun; that he shot Browning while the group was in a secluded place; that he had both the presence of mind and the physical ability to help put Browning's body back into Browning's truck; that when the group stopped at the second secluded place he ordered Epperson to set the truck on fire; and that soon after returning to Harlan he disposed of his clothes by throwing them in the river and demanded the $1,000.00 that had been promised him for the killing.

To be sure, the jury was not obliged to believe Dwayne Harris's and Epperson's testimonies, but even construed favorably to Harris, the evidence showed only that, although he had drunk heavily that afternoon, at least an hour-and-a-half before

the offense he understood his son-in-law's request to borrow money, he was in sufficient control of himself and was aware enough of his circumstances to join Dwayne Harris and Epperson's excursion with Browning, and after returning to Harlan he not only remembered the killing but boasted of it. This evidence does not suffice to permit a finding that at the time of the offense Harris was so intoxicated that he did not know what he was doing. *Cf. Stanford v. Commonwealth,* 793 S.W.2d 112 (Ky.1990) (smoking cocaine and drinking beer a half-an-hour to an hour-and-a-half before the offense did not justify intoxication instruction where evidence showed that defendant was still capable of driving.); *Nichols v. Commonwealth,* 142 S.W.3d 683 (Ky.2004) (instruction required where shortly before the offense the defendant drank heavily and was observed behaving "wildly" and "out of control."). The trial court did not abuse its discretion, therefore, when it rejected Harris's request for intoxication and second-degree manslaughter instructions.

## III. Harris Was Not Entitled To A Directed Verdict.

Harris's final contention, that he was entitled to a directed verdict of acquittal can be quickly rejected on the record before us. We may overturn the trial court's denial of a motion for directed verdict only if, considering the evidence as a whole and drawing all reasonable inferences in favor of the Commonwealth, "it would be clearly unreasonable for the jury to find guilt." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). Harris concedes that the testimonies of Dwayne Harris and Epperson, if believed, were sufficient to support his conviction, but he maintains that accomplice testimony is so inherently suspect that Harris and Epperson could not reasonably be believed. He relies on a former rule of criminal proce-

dure, old RCr 9.62, pursuant to which accomplice testimony was deemed suspect and would not support a conviction unless corroborated.

■ The short answer to Harris's argument is that RCr 9.62 was abolished nearly thirty years ago. *Murphy v. Commonwealth,* 652 S.W.2d 69 (Ky.1983). Under current rules, the credibility of witnesses is left to the jury to assess, *Davis v. Commonwealth,* 147 S.W.3d 709 (Ky.2004), and uncorroborated accomplice testimony can support a conviction, *Hodge v. Commonwealth,* 17 S.W.3d 824 (Ky.1999). Even under the old rule, moreover, accomplice testimony could support a conviction if corroborated by any evidence independently tending to connect the defendant to the crime. *Deskins v. Commonwealth,* 512 S.W.2d 520 (Ky.1974). Here, the testimonies by Dana Tackett and Robert Harris to the effect that Raymond Harris had a large amount of cash a few hours after the shooting, that he then appeared blackened by smoke, and that he admitted his role in the murder, as well as the evidence that Harris left Harlan a few days after the shooting and remained in Lexington while the case was being investigated was sufficient corroboration to permit reliance on the testimony of Dwayne Harris and Epperson. The trial court did not err by denying Harris's motions for a directed verdict.

### CONCLUSION

In sum, Harris has not identified any ground for relief. The trial court did not abuse its discretion during jury selection by refusing to dismiss jurors who, although in favor of the death penalty for particularly egregious crimes, could nevertheless consider mitigating evidence and the full range of authorized penalties. Additionally, the court did not abuse its discretion by dismissing three jurors who stated categorically that they could not impose the death penalty, or by deeming both a husband and wife qualified to serve on the jury where neither's independence had been shown to be lacking. Nor did the trial court abuse its discretion by finding the evidence of Harris's intoxication insufficient to justify an instruction on that defense or on second-degree manslaughter. Finally, the court did not err by considering accomplice testimony in denying Harris's motions for directed verdict. Accordingly, we affirm the May 5, 2008 Judgment of the Bell Circuit Court.

All sitting. All concur.