# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2024-SC-0111-MR

ANTHONY DWAYNE BEDFORD                       APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE ERIC JOSEPH HANER, JUDGE
NOS. 22-CR-001168 AND 23-CR-002316

COMMONWEALTH OF KENTUCKY             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Anthony Bedford appeals his sentence of fifty-five years' imprisonment for his convictions of murder, possession of a handgun by a convicted felon, tampering with physical evidence, and being a first-degree persistent felony offender. For the following reasons we affirm the Jefferson Circuit Court.

## I. BACKGROUND

Bedford had been living with his girlfriend, Ranna Bowen, for eight years when she was shot and killed in their apartment in Louisville, Kentucky on the morning of April 21, 2022. A neighbor in a downstairs apartment called 911 to report a gunshot and hearing a man screaming "baby get up, get up, get up, get up." Additionally, Ranna's mother testified she received a phone call from Ranna's phone that same morning. Ranna's mother could hear Bedford saying "Ranna, I didn't mean to do it, baby. I didn't mean to do it." The police arrived

at Bedford's apartment and waited for about a minute before Bedford let them inside. Officer Eric Burnett's bodycam recorded officers asking Bedford what happened, and he responded "she playing . . . playing with my gun, man. I don't know, we've been drinking, but, man. Oh, my God." The bodycam footage also showed Bedford attempting to wash his hands in the kitchen sink before sitting down when police asked.

Homicide Detective Chris Rutherford, also testified that there were signs of an attempt to clean up some of the blood at the scene including a bloody rag, blood smears from the rag, and blood in the bathroom sink while the faucet was still running. Officers asked Bedford where the gun was located and he responded, "I don't know." The gun was subsequently found in the living room under some clothing when officers executed a search warrant.

Officers found Ranna's body inside the bedroom with blood spattered around her and on the bedroom wall. Louisville paramedic Elizabeth Martel arrived at the scene shortly after the police. She entered Bedford's apartment to find a police officer attempting CPR on Ranna, but the officer stopped once Martel determined she was deceased. Martel determined Ranna was deceased due to her lack of pupillary response, her body felt dry to the touch,[1] and the obvious mortal wound to Ranna's head. The medical examiner, Dr. Donna Stewart, testified that Ranna died from a single gunshot wound to the upper

---

[1] Martel explained at trial that people who are alive usually start to sweat in response to certain events. Ranna's body felt dry, which was an indicator that she was deceased.

2

left eyelid/eyebrow that was close to a straight path and that the barrel of the gun had been about 24 inches from her face. Dr. Stewart also testified that Ranna had a bruise on the right side of her forehead, a bruise on her back, and a "lacy . . . patterned . . . contusion" on the back of her left upper arm. She opined that all of these injuries were inflicted around the same time as the gunshot wound. It was Dr. Stewart's opinion that Ranna died by homicide, not suicide. Dr. Stewart described how Ranna would have been found if she had shot herself with the gun, but there were no facts from which Dr. Stewart could conclude Ranna shot herself.

After officers responded to the apartment Bedford was taken to the police station for questioning. Det. Rutherford asked Bedford to explain what happened that morning at his apartment. Bedford acknowledged that he and Ranna were the only people in the apartment at the time of the shooting. He stated he had left the previous night with other people and when he got back he and Ranna, who were both intoxicated, started to argue over what she thought he had been doing while he was out. About two or three hours after Bedford got back to the apartment, he went to the bathroom and was in the bathroom when he heard a gunshot. Bedford told Det. Rutherford he did not see a gun when he went to the bathroom, and he denied saying anything at the scene about Ranna playing with a gun. Bedford said he did not own the gun nor did he know where it came from. Bedford claimed he never touched the gun but further stated he could not remember if he had moved it while he was attempting to help Ranna. Bedford denied having spoken to any other officers

3

that morning.  When Det. Rutherford asked what Ranna was doing when Bedford went to the bathroom, he answered that he was intoxicated and did not remember.  Bedford further claimed that he had blood on him from attempting to help Ranna.  Bedford told Det. Rutherford he called 911 but did not remember if he used his phone or Ranna's phone to make the call.  Det. Rutherford testified at trial that neither phone had any records of a 911 call being made.  After Bedford made the foregoing statements Det. Rutherford left the interview room, and when he returned Bedford exercised his right to an attorney under *Miranda*.

The Commonwealth also presented testimony from Karl Price, a former prosecutor and neighbor of Bedford and Ranna.  Price testified that two weeks before Ranna's death he saw Bedford strike her in the face while the two were walking down the street.  However, Price did not report the incident to anyone.

While Bedford did not testify, his counsel argued that the statements Ranna's mother could hear Bedford making over the phone were not those of someone who would intentionally kill another person and that Ranna's death was a horrific accident.  The jury ultimately convicted Bedford of murder, possessing a handgun as a convicted felon, tampering with physical evidence, and found him to be a persistent felony offender.  It recommended a total of fifty-five years to serve, and the trial court sentenced Bedford accordingly. Bedford now appeals.  Additional facts will be developed as needed.

## II. ANALYSIS

On appeal, Bedford raises three arguments. First, Bedford argues that the trial court erred by not instructing the jury on reckless homicide. Second, Bedford argues the trial court erred by denying his motion to suppress all the statements he made to Det. Rutherford. Last, Bedford argues that the trial court erred when it allowed the Commonwealth to admit Price's testimony into evidence.

### A. The trial court did not err when it declined to instruct the jury on reckless homicide.

Bedford argues that he was entitled to a jury instruction on reckless homicide because the evidence—specifically Ranna's injuries, Bedford's statements made immediately after she was shot, and his statements later made to the police—was purely circumstantial and did not not conclusively demonstrate his state of mind. At trial, Bedford requested and submitted jury instructions for second-degree manslaughter and reckless homicide. The trial court instructed the jury on both intentional and wanton murder and second-degree manslaughter but declined to instruct on reckless homicide.

A trial court's decision to deny a request for a lesser-included instruction is reviewed under an abuse of discretion standard. *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Schwab*, 628 S.W.3d 112 (Ky. 2021). A trial court abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

5

"It is well established that the trial court is required to instruct the jury on the whole of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Gribbins v. Commonwealth*, 483 S.W.3d 370, 737 (Ky. 2016) (quoting *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999)). Thus, "a trial court is required to instruct the jury on affirmative defenses and lesser-included offenses if the evidence would permit a juror [to] reasonably conclude that the defense exists or that the defendant was not guilty of the charged offense but was guilty of the lesser one." *Harris v. Commonwealth*, 313 S.W.3d 40, 50 (Ky. 2010). Additionally, if

> a defendant claims an alibi, or the evidence is purely
> circumstantial and does not conclusively establish his
> state of mind at the time he killed the victim, it is
> appropriate to instruct on all degrees of homicide and
> leave it to the jury to sort out the facts and determine
> what inferences and conclusions to draw from the
> evidence.

*Commonwealth v. Wolford*, 4 S.W.3d 534, 539-40 (Ky. 1999). An instruction on a lesser-included offense may be denied by the trial court when the evidence does not support the instruction. *Harris*, 313 S.W.3d at 50.; *see also Payne v. Commonwealth*, 656 S.W.2d 719, 721 (Ky. 1983).

Pursuant to KRS[2] 507.020(1)(a) and (b), an individual commits the crime of murder by either intentionally causing the death of another person when not influenced by an extreme emotional disturbance, or, when "under

---

[2] Kentucky Revised Statute.

circumstances manifesting extreme indifference to human life," an individual "wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." Under KRS 507.050(1), "a person is guilty of reckless homicide when, with recklessness he causes the death of another person." A person acts with recklessness when he "fails to perceive a substantial and unjustifiable risk" that his actions could result in the death of a person and his failure to realize the risk is a "gross deviation from the standard of care that a reasonable person would observe in the situation." KRS 501.020(4). The difference between wantonness and recklessness is "wanton conduct involves conscious risk-taking while reckless conduct involves inadvertent risk-creation." LRC Commentary to KRS 501.020 (1974).

An instruction on reckless homicide would be warranted in this case if there was evidence to support the reasonable inference that Bedford "failed to perceive a substantial and unjustifiable risk" that his actions could result in Ranna's death. KRS 507.050(1); *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 197 (Ky. 2017). Bedford cites to *Wolford* in support of his assertion that the trial court should have instructed the jury on reckless homicide. 4 S.W.3d at 534. However, *Wolford* is distinguishable. *Wolford* involved three defendants who had been charged with the murders of Junior and Kevin Coleman: Duffy Wolford, Blaine Wolford, and Charlie Wolford. *Id.* at 536-37. The defendants never "admitted [to] firing the fatal shots, all claimed an alibi, and the evidence of guilt was purely circumstantial." *Id.* at 537. All three defendants made

7

statements about their activities the night Junior and Kevin were killed which were later contradicted by either themselves or other family members. *Id.* at 583. Thus, the Court held that

> [t]his jury believed beyond a reasonable doubt that the appellees, as principals or accomplices, shot the Colemans and that they did so without justification; but did not believe the evidence was sufficient to prove that they did so with an intent to cause the Colemans'
>
> deaths. Therefore, it was not irrational for the jury to convict the appellees of an offense requiring a less culpable mental state than intent, *e.g.*, second-degree manslaughter.

*Id.* at 540.

Bedford did not admit in his interview with Det. Rutherford that he shot the gun and killed Ranna, there were no witnesses to the shooting other than Bedford, and his "alibi" was that he was in the bathroom when the shooting occurred. However, Ranna's mother testified that she received a call from her daughter's phone the morning Ranna was shot and could hear Bedford saying, "Ranna, I didn't mean to do it, baby, I didn't mean to do it." The gun used to shoot Ranna was hidden under clothing in a completely different room than the room in which Ranna's body was found. Officers testified that water had been running in the bathroom when they entered the apartment and that bloody rags indicated an attempt to clean up the scene. Bedford had blood on his hands which he attempted to eliminate in the kitchen sink. Bedford first told responding officers that Ranna was playing with his gun when it fired but later changed his story to say that he was in the bathroom when Ranna was shot and denied saying anything about her playing with the gun. However, Dr.

8

Stewart determined her death was a homicide as she was shot about 24 inches away from her face. Additionally, there were other fresh injuries found on Ranna, and Price testified that Bedford had hit Ranna in the face just two weeks before she died.

Accordingly, the evidence in this case did not present the same potential for confusion as the evidence in *Wolford*. And, as Bedford's jury found him guilty of murder, it believed the evidence was sufficient to prove Bedford shot Ranna with either the intent to cause her death or that he shot her by wantonly engaging in conduct which created a grave risk of death under circumstances manifesting an extreme indifference to human life. A reasonable jury could not consider the evidence before them in this case and find Bedford guilty of reckless homicide. *Harris*, 313 S.W.3d at 50. Moreover, Bedford's jury was instructed on second-degree manslaughter, yet given all the evidence, they convicted him of murder. Common sense dictates that if the jury's deliberation eliminated the second-degree manslaughter charge, which required finding Bedford acted wantonly, it would not have found him guilty of a still lesser crime, reckless homicide, which only required a finding that he acted recklessly. Thus, even if we were to hold that the trial court erred when it declined the jury on reckless homicide, it would have been a harmless error. *See* RCr[3] 9.24.

---

[3] Kentucky Rule of Criminal Procedure.

9

**B. The trial court did not err when it denied Bedford's motion to suppress the statements he made to Det. Rutherford.**

Bedford's second argument is that the trial court erred when it denied his motion to suppress all the statements he made to Det. Rutherford based on his assertion that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights. Bedford moved to suppress the statements he made to Det. Rutherford on the basis that he was intoxicated and did not sign the *Miranda* rights waiver form that Det. Rutherford read to him at the police station.[4] The trial court conducted a suppression hearing, and the Commonwealth agreed not to introduce any of Bedford's statements past the point where he requested an attorney. The trial court otherwise denied Bedford's motion to suppress, finding that Bedford did not initially invoke his rights and was not so intoxicated that his statements were unreliable.

The Fifth Amendment provides that, "[n]o person shall be...compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V; *see also* Ky. Const., § 11. Therefore, officers may not conduct custodial interrogations before apprising an individual of their rights to remain silent and to an attorney. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Id.* When an individual invokes his Fifth Amendment right to remain silent, the custodial interrogation must stop. *Id.* at 473-74. The right

---

[4] The written waiver form was not offered to Bedford for a signature.

to remain silent is successfully invoked when a person conducts himself "in a manner that a reasonable police officer in the situation would understand that the suspect wished for questioning to cease." *Carson v. Commonwealth*, 621 S.W.3d 443, 451 (Ky. 2021) (quoting *Meskiman v. Commonwealth*, 435 S.W.3d 526, 531 (Ky. 2013)).

While there is a presumption against a person waiving his or her *Miranda* rights, a waiver may be made "voluntarily, knowingly, and intelligently" and given implicitly or explicitly. *Dillon v. Commonwealth*, 475 S.W.3d 1, 13 (Ky. 2015); *Wise v. Commonwealth*, 422 S.W.3d 262, 271 (Ky. 2013); *McCloud v. Commonwealth*, 286 S.W.3d 780, 787 (Ky. 2009). A waiver of *Miranda* rights is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and if the waiver was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987). "In order for a waiver to be considered valid, the Commonwealth must show by a preponderance of the evidence that the defendant made an uncoerced choice to abandon his constitutional rights." *Cox v. Commonwealth*, 641 S.W.3d 101, 114 (Ky. 2022). An additional assessment of the circumstances surrounding the interrogation is made to help determine the voluntariness of a waiver, "including the background, experience, and conduct of the accused." *Cox*, 482 S.W.3d at 114 (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)).

11

When reviewing a trial court's ruling on a suppression motion, an appellate court examines the trial court's factual findings for clear error and considers any factual findings conclusive if they are supported by substantial evidence. *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011). The trial court's application of the law is reviewed *de novo. Id.*

During the hearing on Bedford's motion to suppress the trial court identified two issues to be addressed. The first was whether Bedford effectively invoked his *Miranda* rights. The trial court found that, while Bedford did initially state "no, sir" when Det. Rutherford asked if he would speak to him, Bedford reengaged in conversation with Det. Rutherford, continued to speak to him, and answered his questions. The trial court discerned that Bedford did not, at any point during the interview say, "I do not want to talk with you," or otherwise attempt to "shut down" Det. Rutherford's questioning. The trial court further found that Det. Rutherford asked Bedford many times during the course of the interview whether he read and understood everything in the *Miranda* waiver form and Bedford never indicated he did not. On the second issue identified by the trial court, whether Bedford was so intoxicated that his statements were unreliable, the trial court found that it did not hear anything it considered coercive in any way from Det. Rutherford and rejected Bedford's argument that not signing the *Miranda* waiver form was somehow coercive.

This Court finds that the trial court's findings of fact were supported by substantial evidence. During the interview with Det. Rutherford, Bedford

12

indicated that he knew what his rights were when asked about them, and then following exchange occurred:

> **Det. Rutherford**: Um, knowing your rights, are you willing to talk to me?
>
> **Bedford**: No, no sir.  I mean, I ain't.  This is crazy what happened to her, you know.  We both intoxicated, though.
>
> **Det. Rutherford**: Okay.
>
> **Bedford**: You know, but it was just so fast man, you know.  That's just all I can say, you know.

Det. Rutherford again asked if Bedford was willing to speak about what happened, and Bedford responded, "that's what I'm talking about."  Det. Rutherford advised Bedford again he was not under arrest but was going to repeat Bedford's rights to him.  Bedford responded in the affirmative, and Det. Rutherford stated, "if you're willing to talk to me, [the waiver form] just says…" and began to read the *Miranda* waiver form that advised a person of the rights they were waiving and indicated that a person was agreeing to speak.  After Det. Rutherford read the form, Bedford nodded his head up and down and replied with an affirmative sound.  Det. Rutherford testified that he did not ask Bedford to sign the form because the blood on Bedford created a biohazard.

Det. Rutherford then asked Bedford to tell him what happened that morning.  Bedford stated that he and Ranna were intoxicated, he heard a shot while he was in the bathroom, and he found Ranna bleeding on the floor in the bedroom.  He did not see any gun when he went to the bathroom, did not know where the gun came from, and claimed he did not own the gun.  Bedford could not recall if he moved the gun when he was trying to help Ranna, but he

13

confirmed that his fingerprints should not be on it.  Bedford told the detective that he had left earlier in the night with other people before returning to the apartment in the morning.  When he returned to the apartment he and Ranna, who were both intoxicated, began arguing.  Bedford claimed he could not remember what Ranna was doing when he went to the restroom.  Bedford denied making any statements at the scene about Ranna playing with a gun and denied making any statements other than what he had said to Det. Rutherford.  Bedford told Det. Rutherford he attempted to call 911 but could not remember if he used his phone or Ranna's phone.  Bedford repeated that he was shaken up from the events and that Ranna getting shot happened very quickly.

All the above statements from Bedford occurred after Det. Rutherford informed him of his rights multiple times and after Bedford stated that he did not want to talk yet he continued to do so.  Det. Rutherford checked in with Bedford multiple times to make sure he understood what was going on and Bedford indicated that he knew his rights.  Bedford continued to speak to Det. Rutherford, thus negating his initial indication of exercising his right to remain silent.

Before this Court, Bedford argues his post-*Mirandized* response of, "no, sir," when Det. Rutherford asked him if he would discuss the events of the day effectively invoked his right to remain silent.  In *Wise*, the defendant was advised of her *Miranda* rights and then read and signed a rights-waiver form before completing a polygraph examination.  *Wise*, 422 S.W.3d at 265-66.  The

14

defendant then confessed to killing her husband in a post-polygraph interview with police officers. *Id.* at 267. The *Wise* Court held that "proceeding with the polygraph examination after being advised of her rights was 'inconsistent with their exercise' and her actions can be interpreted as 'a deliberate choice to relinquish the protection those rights afford.'" *Id.* at 271 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010)).

The defendant in *Wise* argued that she did not knowingly waive her rights because the waiver was not made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon them." *Id.* at 272. This Court determined she was fully aware because the waiver form she read and signed sufficiently stated her rights. *Id.* Importantly, the Court noted that the waiver of her rights did not come from her signing the waiver form itself; rather, the defendant's waiver came from "her deliberate and continuing choice to act in a manner inconsistent with her rights once she had been advised of them." *Id.* "[T]he nature of an implied waiver—depending as it does on the defendant's knowledge of her rights and action inconsistent with an exercise of those rights—necessarily makes it a knowing waiver." *Id.* Thus, the defendant was fully aware of her rights and the consequences of abandoning those rights when she impliedly waived them by participating in a polygraph examination and making statements to officers in a post-polygraph interview. *Id.*

Here, although Bedford initially indicated he did not want to speak to Det. Rutherford he thereafter conducted himself in a manner that a reasonable

15

officer could not interpret as a desire for the questioning to cease. *Carson*, 621 S.W.3d at 451. Bedford indicated several times that he understood his rights and thereafter gave a full statement to Det. Rutherford about the events leading up to and following the shooting. The trial court accordingly did not err by ruling that Bedford did not effectively invoke his right to remain silent.

Bedford further argues before this Court that his state of intoxication made it impossible for him to waive his *Miranda* rights with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

"The fact that a person is intoxicated does not necessarily disable him from comprehending the intent of his admissions or from giving a true account of the occurrences to which they have reference." *Peters v. Commonwealth*, 403 S.W.2d 686, 689 (Ky. 1966). There are two situations where a person's level of intoxication could influence a motion to suppress. *Smith v. Commonwealth*, 410 S.W.3d 160, 164 (Ky. 2013). First, police may be able to easily coerce and overcome the will of someone who is intoxicated compared to someone who is not. *Id.* Police coercion of someone who is intoxicated could "render the confession involuntary for purposes of the Due Process Clause." *Smith*, 410 S.W.3d at 164; *see also Jones v. Commonwealth*, 560 S.W.2d 810, 814 (Ky. 1977) (holding "under certain circumstances," intoxication could be a component causing a confession to be suppressed due to involuntariness). Second, a defendant's statements may be suppressed if he was "intoxicated to the degree of mania," or was "unable to understand the meaning of his

16

statements" for other mentally hindering reasons such as hallucinating or insanity. *Id.* (quoting *Halvorsen v. Commonwealth*, 730 S.W.2d 921, 927 (Ky. 1986)). If a defendant makes statements to officers under those circumstances the statements may be suppressed because they are unreliable. *Id.* at 165.

Bedford was not so intoxicated that he was easily coerced into speaking, and the statements he made were not involuntary or unreliable. Det. Rutherford *Mirandized* Bedford before asking him any questions and continued to check in with Bedford to make sure he understood the situation. Det. Rutherford read Bedford the *Miranda* rights waiver form and Bedford nodded his head in acknowledgment. There was no point at which Bedford asked Det. Rutherford to further explain anything or expressed any confusion about discussing the events surrounding Ranna's death. Det. Rutherford testified that Bedford's speech may have been slurred at times, but he did not appear to be manifestly under the influence and answered all of his questions in an appropriate manner. There was no evidence of coercion on part of Det. Rutherford and Bedford was not so intoxicated that he did not comprehend the situation. Bedford's will was not overtaken by coercion and his statements were not unreliable due to substance-induced insanity or mania. *Smith*, 410 S.W.3d at 164.

Finally, Bedford asserts that by not signing the waiver of rights form that he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights. In *Campbell v. Commonwealth*, this Court held that the defendant had voluntarily waived his rights despite not signing the waiver of rights form. 732 S.W.2d

17

878, 880-81 (Ky. 1987). There was no requirement that Bedford sign the waiver of rights form in order for him to understand his rights and knowingly, voluntarily, and intelligently waive them.

For the reasons stated above and considering "the totality of the particular facts and circumstances surrounding the case," Bedford voluntarily, knowingly, and intelligently waived his *Miranda* rights with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Cox*, 641 S.W.3d at 114. Thus, the trial court did not abuse its discretion by denying Bedford's motion to suppress the statements he made to Det. Rutherford before asking for an attorney.

## C. The trial court did not err when it allowed the Commonwealth to introduce Price's testimony under KRE[5] 404(b).

Bedford's final argument is that the trial court erred by allowing the admission of Price's testimony that he saw Bedford hit Ranna two weeks prior to her death. Prior to trial, the Commonwealth moved under KRE 404(c) to introduce KRE 404(b) evidence, and Bedford objected. The trial court granted the Commonwealth's motion and allowed the testimony.

At trial, Price testified that Bedford and Ranna lived across the street from him. Price did not know the two personally and did not know their names, but he had spoken to Ranna before. About two weeks prior to Ranna's death, Price was driving home from work when he saw Bedford and Ranna walking down the street. According to Price, Bedford suddenly lashed out and

---

[5] Kentucky Rule of Evidence.

18

hit Ranna in the face. Price testified that Ranna covered her face with her hands in response to the hit before continuing to walk behind Bedford. Price described Bedford as walking animatedly, as if the two had been arguing. However, Price could not hear if the two said anything to each other. Price was "unsure about what hand" Bedford used, but thought he saw "motion from his right arm," and guessed Bedford used his right arm to hit Ranna. After witnessing the strike, Price circled the block and parked in front of his house. Price testified that he could see the pair crossing the street—Bedford was still walking in a "somewhat animated manner," while Ranna followed him. The two then entered their apartment complex. Price testified he had never witnessed any other acts of violence between the pair until that day, and he did not report the incident to the police because he did not want to get involved.

Before this Court, Bedford argues that Price's testimony was improper other-act evidence under KRE 404(b) and that his act of hitting Ranna is not the same as shooting and killing her. Bedford argues Price's testimony was improper character evidence and that "a defendant may not be convicted on the basis of low character or criminal predisposition, even though such character or predisposition makes it appear more likely that the defendant is guilty of the charged offense." *Southworth v. Commonwealth*, 435 S.W.3d 32, 48 (Ky. 2014) (quoting *Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992)). Bedford further asserts that any relevancy or probativeness Price's testimony provided was far outweighed by the "inherently and highly prejudicial" nature of the testimony. *Bell v. Commonwealth*, 875 S.W.2d 882, 890 (Ky. 1994).

19

Evidentiary issues are reviewed for an abuse of discretion. *Conley v. Commonwealth*, 599 S.W.3d 756, 772 (Ky. 2019). A trial court abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. KRE 404(b) reads:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible.
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

"Evidence of similar acts perpetrated against the same victim are almost always admissible." *Harp v. Commonwealth*, 266 S.W.3d 813, 822-23 (Ky. 2008). In *Driver v. Commonwealth*, the Court determined that KRE 404(b) evidence of other violent acts committed by the defendant against the victim were admissible. 361 S.W.3d 877, 885 (Ky. 2012); *see also Mosley v. Commonwealth*, 960 S.W.2d 460 (Ky. 1997) (holding that past occasions that the defendant abused the victim were relevant to show he did not accidentally shoot and kill the victim).

At trial, Bedford's defense was that he accidentally shot Ranna. The testimony from Price was therefore introduced by the Commonwealth for the purpose of showing an intent and an absence of mistake when Bedford later

20

shot her. Because other bad acts may be properly introduced for a purpose other than proving a defendant's character and because other acts of violence committed by a defendant against the same victim are almost always admissible, the trial court properly admitted Price's testimony into evidence.

Bedford concedes that Price's testimony may be relevant but maintains that the prejudicial nature of the testimony is substantially outweighed its probative value. The relevancy, probativeness, and prejudice of other bad act evidence must be weighed to determine admissibility, and a prior act of violence by Bedford against Ranna is both relevant and probative such that any danger of undue prejudice is outweighed. *Bell,* 875 S.W.2d at 889. The *Bell* Court determined that testimony from an alleged second victim, although relevant and probative, was inadmissible due to the highly prejudicial nature of the crime, child sexual assault. *Id.* at 890. The testimony was also uncorroborated, as the alleged crime had never been charged and the only other testimony introduced addressing the second victim was hearsay. *Id.* However, the testimony barred from admission in *Bell* was from a *second* victim—not the named victim in the case. In Bedford's case, Price's testimony was about the same victim. As established above, evidence of other violent acts committed by a defendant against the same victim are "almost always admissible." *Harp,* 266 S.W.3d at 822-23. Additionally, it is well settled that the probative value of past violent acts against a victim is not always substantially outweighed by its prejudicial effect. *Jenkins v. Commonwealth,* 496 S.W.3d 435, 458 (Ky. 2016) (holding evidence of defendant sexually

21

assaulting the same victim was admissible in trial for first-degree rape and sodomy); *Noel v. Commonwealth*, 76 S.W.3d 923, 931 (Ky. 2002) (stating that evidence of prior acts, threats, violence, or animosity are almost always admissible under KRE 404(b) because it is almost always significantly probative of a material issue other than the defendant's character); *Dante v. Commonwealth*, 258 S.W.3d 12 (Ky. 2008) (determining that the probative value of evidence that the defendant had previously shaken his young daughter to stop her crying was an admissible prior act showing pattern of conduct and its probative value was not outweighed by its prejudicial nature). Thus, the trial court did not abuse its discretion when it allowed Price's testimony.

### III. CONCLUSION

For the foregoing reasons, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Joshua Michael Reho
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General